1823.

FIELD

v

SCHIEFFELIN

MOSES FIELD *against* SCHIEFFELIN and others.

A guardian, having the legal power to sell or dispose of the personal estate of his ward, in any manner he may think most conducive to the purposes of his trust, a purchaser who deals fairly, has a right to presume that he acts for the benefit of his ward, and is not bound to inquire into the state of the trust; nor is he responsible for the faithful application of the money, unless he knew, or had sufficient information at the time, that the guardian contemplated a breach of trust, and intended to misapply the money; or was, in fact, by the very transaction, applying it to his own private purpose.

*April* 26th.

THE bill, filed *February* 3d, 1821, stated, that the defendant, *Jacob Schieffelin*, on the 31st of *December*, 1816, executed a bond to the defendant, *William James Stewart*, as *guardian* of *William J. Hopkins*, an infant, for 5000 dollars, payable the 31st of *December*, 1821, with interest; and to secure the payment, he also executed a mortgage of seven acres of land, &c. That on the 25th of *August*, 1819, the defendant, *W. J. S.*, applied to the plaintiff to advance the amount of the bond and mortgage, representing that he wanted the money for the purposes of the infant's estate, and that he had authority to assign the bond and mortgage; and the plaintiff advanced to him the sum of 5228 dollars and 47 cents, being the amount of the principal and interest then due; and *W. J. S.*, as guardian, duly assigned over the bond and mortgage to the plaintiff, with power to collect the same for his own use and benefit. The interest to the 31st of *December*, 1819, was paid, but there was now due 350 dollars for interest, and t e whole of the principal. That the defendant, *John J. Stewart*, who is surety for *W. J. S.*, the guardian of the infant, alleged, that the bond and mortgage still belonged to the infant, on the ground that the guardian had no right to assign the same to the plaintiff; and had procured an order, *ex parte*, on the defendant, *J. Schieffelin*, not to pay

the bond to the plaintiff : *Prayer*, that the defendants, or one of them, be decreed to pay to the plaintiff the principal and interest due on the bond, and the costs ; or that the mortgaged premises be sold, &c.

The defendant, *Schieffelin*, in his answer, admitted the bond and mortgage, and sum due, as charged in the bill ; and stated, that on the 2d of *January*, 1822, *J. J. S.* and the infant, gave him notice in writing, not to pay the plaintiff, as the guardian had no right to assign the bond and mortgage to the plaintiff ; that, had it not been for this notice, he would have paid the interest, and was ready to pay as the Court shall direct.

The defendant, *W. J. S.*, admitted that he took the bond and mortgage as guardian, having been duly appointed guardian of the person and estate of *H.* That the interest was paid to him for two years. That, being in want of money, he applied to the plaintiff in *August*, 1819, to advance the amount. That, at that time, the mortgage security was not worth more than 2000 dollars, there being a previous mortgage on the premises for 1000 dollars, of which he was ignorant when he took the mortgage. That he believed it to be for his interest to sell the mortgage. That he represented to the plaintiff, that he had full right to sell the bond and mortgage, as guardian. That the plaintiff paid him the full amount of the bond and mortgage which he assigned to him, as stated in the bill, &c.

The defendant, *J. J. S.*, answered, that *W. J. S.* was appointed guardian of the infant, *H.*, on the 18th of *October*, 1816, and that *J. J. S.* and *Thomas Bulkley* were his sureties, in a bond for 20,000 dollars. That the plaintiff, by an agent, proposed to the guardian to buy the bond and mortgage in question ; and *knew* that the guardian had no occasion for the money, for the purpose of the estate of the infant, nor any authority to assign it. That, in order to defraud this defendant, as surety of the guardian, the plaintiff induced the guardian to apply to the

1823.

FIELD
v.
SCHIEFFELIN

defendant, *Schieffelin*, to give a new bond and mortgage, in his own name, and not as guardian, on condition that the other should be cancelled, so that the plaintiff might take an assignment of it. That failing in this application, he requested *J. J. S.*, on the 5th of *August*, 1819, to give a new bond and mortgage, at a lower rate of interest, and that the interest then due should be abandoned. That before the plaintiff advanced any money to *J. J. S.* and took the assignment, he knew that the moneys secured by the bond and mortgage belonged to the infant, and was advised against taking the assignment, as it would be unjust and illegal. This defendant insisted, that the infant was still entitled to the moneys secured by the bond and mortgage. He admitted the notice and order on *S.* not to pay the plaintiff. The answer of the infant, by his guardian, *E. Elmendorf*, was to the same effect.

The cause was brought to a hearing on the pleadings and proofs.

*Wells*, for the plaintiff.

*T. A. Emmet*, for the defendants.

THE CHANCELLOR. The bond and mortgage which the plaintiff claims, were taken by *William James Stewart*, in his character of guardian of the person and estate of *Hopkins*, the infant, and to which trust he had been duly appointed by this court. That he had a legal control over that bond and mortgage, and a right to collect and receive the money due thereon, and a legal right to sell and assign the same, in the due exercise of his discretion as guardian, is a proposition that does not seem to admit of dispute. The bond was not due when it was assigned to the plaintiff; but if the money was wanting for the purposes of the trust, either for discharging incumbrances, or for making more advantageous investments, or for payment of debts,

and for the better maintenance and education of the ward, or for any purpose whatever, connected with the faithful discharge of the trust, and beneficial to the infant, the guardian had just right and lawful authority to raise the money by the assignment of the bond and mortgage. The necessity or expediency of the measure rested entirely in the judgment and discretion of the guardian. He was, as between him and the purchaser, the proper and the exclusive judge of that expediency. It was not the duty or the business of the purchaser to inquire into the necessity of the assignment, or to see to the application of the purchase money. He had a right to presume, in the absence of all direct and plain proof to the contrary, that the guardian was exercising his power fairly and faithfully, in conformity with his duty.

This case, then, turns upon the question of fact, whether the guardian committed a breach of trust in the assignment of the bond and mortgage, and whether the plaintiff was a party to that breach of trust. If there was any fraud or collusion between the plaintiff and the guardian, or if the plaintiff knew or was sufficiently informed, when he accepted of the bond and mortgage, that the guardian had in contemplation a breach of trust, and intended to misapply the moneys, then, I apprehend that the plaintiff must be deemed to have taken the bond and mortgage in trust for the infant. But, on this point there is not sufficient evidence to affect the right and title of the plaintiff.

The assignment purports, on its face, to be for a fair and valuable consideration, and the answer of the guardian admits the payment of that consideration, and there is nothing in the proof to gainsay it. There is no direct or positive evidence that the guardian has, in truth, misapplied or wasted the infant's money. It might be inferred from the acknowledged fact of his insolvency, and from the silence of the case; but when it becomes necessary, not only to establish the fact of breach of trust, but of a participa-

tion of the plaintiff in the fraud, we ought to have something more decisive than a presumption resting on such a basis. It is very possible, and consistent with every established fact in the case, that the money received by the guardian from the plaintiff, was duly invested in other property, in the name and for the benefit of the infant, and was left untouched amidst the waste and destruction of his own property. But if the presumption of a *devastavit* is to be admitted, there is no evidence that the guardian had any abuse of trust in contemplation, when he made the assignment, or, if such were his intention at the time, there is no certain and sufficient proof that the plaintiff knew or had information of that intention, or of any purpose or design in the guardian inconsistent with his duty. The proof on the part of the infant, is too lame and scanty to justify the conclusion of any breach of trust in the guardian, in which the plaintiff knowingly partook.

A Chancery guardian may, in his discretion, sell the personal property of his ward, for the purposes of his trust, without any previous direction of the Court.

Though it be not in the ordinary course of the guardian's administration, to sell the personal property of his ward, yet he has the legal right to do it, for it is entirely under his control and management, and he is not obliged to apply to this Court for direction in every particular case. It was said by Lord *Hardwicke*, in *Inwood* v. *Twyne*, (*Amb.* 419.) that he might change the nature of the infant's estate, under particular circumstances, and the Court would support him in the act, if the Court would have directed the change under the same circumstances. The question as to the due exercise of the power, arises between the guardian and his ward; and I apprehend that no doubt can be entertained as to the competency of the guardian's power over the disposition of the personal estate, including the choses

So he may lease the real estate; but cannot convey it absolutely without the authority of this Court.

in action, as between him and the *bona fide* purchaser. The guardian in socage of the real estate may lease it in his own name, and dispose of it during the guardianship, (and the chancery guardian has equal authority,) though he cannot convey it absolutely without the special authority of this

Court, because the nature of the trust does not require it. (*Wade* v. *Baker*, 1 Lord *Raym*. 131. *Cro. Jac.* 98. Lord *Ellenborough*, in 10 *East*, 494.) The personal estate is necessarily subject to more unlimited control, and may be invested, called in, and reinvested, and changed and otherwise disposed of, as the exigencies of the trust, in the judgment of the guardian, may seem to require. In every instance he acts under responsibility to his ward, for the faithful and judicious discharge of his trust; but the stranger who deals with him justly and fairly, has a right to. presume that the guardian acts for the benefit of the infant, and he does not partake of that responsibility, until the presumption of fair dealing is destroyed by evidence of fraud and collusion.

The case of third persons dealing with executors and administrators, in their representative character, is analogous, and throws strong light on this subject.

Lord *Hardwicke*, in several decisions before him, would not permit creditors or legatees to follow assets into the hands of a purchaser from the executor or administrator, unless there was evidence of fraud and collusion between them. Thus, in *Nugent* v. *Gifford*, (2 *Ves.* 269. 1 *Atk.* 463.) the executor assigned over a mortgage term of his testator to *C.*, in satisfaction of a debt which the executor owed him; yet the Lord Chancellor held it a good alienation against the creditors and heir. He said the Court would follow the assets in case of fraud, but not where the executor disposed of them for a valuable consideration and without fraud; and that it would be very mischievous if the Court were to control this power of alienation, as no person would venture to deal with executors. The purchaser's knowledge of the debts in general, was immaterial as to the validity of the assignment, provided it was for a valuable consideration; and there was no difference between the power of the executor to dispose of legal and of equitable assets. The same doctrine was maintained in *Mead* v. *Lord Orrery.* (3 *Atk.* 235.) Three

1823.

FIELD
v.
SCHIEFFELIN

A stranger or *bona fide* purchaser is not answerable for the faithful application of the money by the guardian.

So, in the case of the disposition or sale of personal property by *executors* or *administrators.*

It is only in cases of fraud and collusion, that the Court would follow the assets, in the hands of a purchaser.

1823.

FIELD
v.
SCHIEFFELIN

The mere knowledge of the purchaser that the property was assets and that there are debts, is not sufficient to make him responsible.

executors assigned a mortgage of their testator, as a security for the receivership of one of them; and the Chancellor considered it to be a purchase for a valuable consideration, and that there was not sufficient grounds to set it aside. It was good, unless the executor did it collusively; and neither creditors nor legatees could call back the assignment. He said there was no instance where an assignment had been made by an executor for valuable consideration, that Chancery had set it aside, unless some fraud appeared between the executor and the assignee. The knowledge in the third person, that the assignment was made by the executor, of property which he held as assets, did not alter the case. In *Taner* v. *Ivie*, (2 *Ves.* 466.) the same rule prevailed. It was a bill against the purchaser, to whom an executor had assigned a mortgage, which he held as executor. Lord *Hardwicke* said, that if there was fraud or collusion between the executor and purchaser, both would be liable to make satisfaction; and none was made out in that case sufficient to charge the assignee. " I do not know," he observes, " that there can be any general principle, that an assignee, taking security of an estate from the executor, is not to be answerable. The cases all depend on circumstances. Whenever contrivance appears between the executor and assignee of the mortgagee, to make a *devastavit*, the Court would hold the assignee liable."

Lord *Mansfield*, in the case at law of *Whale* v. *Booth*, (cited in 4 *Term Rep.* 625. note.) went equally far in favour of the purchaser of the testator's assets. The general rule, both of law and equity, he observed, was clear, that an executor might dispose of the assets, and that they could not be followed by the testator's creditors. He must sell, in order to effect the will; but who would buy, if liable to be called to an account? If the purchaser knows they are assets, this is no evidence of fraud, for all the testator's debts may have been already satisfied; and if he

knows they are not satisfied, must he look to the application of the money? No one would buy on such terms. There is one exception, indeed, where a contrivance appears between the purchaser and executor, to make a *devastavit*.

Subsequent decisions have, in some degree, restrained the extent of the doctrine laid down by Lord *Hardwicke* and Lord *Mansfield*.

In *Bonney* v. *Ridgard*, (1 *Cox*, 144.) Lord *Kenyon*, the Master of the Rolls, admitted, that, in general, the purchaser from the executor of the testator's assets, was not bound to see to the application of the money; but that if, upon the face of the assignment of the property, it appeared to have been made in satisfaction of a private debt of the executor, the sale was fraudulent against the persons interested under the will, and equity would relieve. It would be a case of implied fraud; and he, accordingly, condemned the decision in *Mead* v. *Lord Orrery*, and said he should have made an opposite decision in that case. His objection, if valid, would apply equally to the case of *Nugent* v. *Gifford*, and overrule it; for there, also, it appeared, the assignment was in satisfaction of the executor's private debt. So again, in *Scott* v. *Tyler*, (*Dickens*, 712.) Lord *Thurlow* held, that where an executrix pledged bonds specifically devised, as a security for her own debt, contracted after the testator's death, the pawnee must deliver up the bond, for the benefit of the specific legatee. He admitted that, in general, the purchaser of the assets had no concern with the application of the price, and that the rule applied equally to mortgages, bonds, and leases. But if one concerted with the executor to obtain the effects at a nominal price, or at a fraudulent under value, or *in extinguishing the private debt of the executor*, or in any other manner, contrary to the duty of the office of executor, the purchaser, or pawnee, will be liable. In this case, bonds of the testator were delivered to the bankers, as a se-

*But if a person knowingly buys or takes the assets, in extinguishment of the private debt of the executor, it seems, that he will not be allowed to retain them against creditors and legatees.*

1823.

FIELD
v.
SCHIEFFELIN

curity for the private debt of the executrix, and they were or-
dered to be delivered up, and the bankers to account for
the interest received; and though the bankers believed
the representation of the executrix, without looking at the
will, it was not sufficient to protect them.   They knew that
the bonds could not be so appropriated, until all the debts
and legacies were paid; and the Chancellor must have
proceeded on the ground of gross negligence,  or  implied
fraud in the bankers.   In *Hill* v. *Simpson*, (7 *Ves.* 152.)
Sir *William  Grant* made a similar decree, by setting
aside the transfer of assets by an executor, to secure a debt
of the executor, under circumstances of gross  negligence,
though not of direct fraud in the creditor, to whom they
were transferred.   He admitted that, for many purposes,
third persons were entitled to consider the executor as ab-
solute owner, and that the stranger should not be put to
examine whether, in the particular instance, the power of
disposition had been discreetly exercised by the executor.
But it does not follow, that the third person must wholly
overlook his character as trustee, when he knows the exe-
cutor is applying the assets to a purpose wholly foreign to
his trust.   The assets, *known  to  be such*, ought not to be
applied, in any case, for the discharge of the executor's
debt, unless the creditor taking the assets, can be first sa-
tisfied of his right so to apply them.   It was gross negli-
gence in the creditor, to abstain, in such a case, from
looking at the will, to see if there be not unsatisfied de-
mands; and the Master of the Rolls afterwards admitted,
that this was the first case in which a mere general pecu-
niary legatee, succeeded in an attempt to follow the assets
aliened by the executor.

The case of *M'Leod* v. *Drummond*, (14 *Ves.* 352.    17
*Ves.* 152. S. C.) was one of a pledge by the executor of
the testator's bonds, upon advances of money.   The bill was
by a co-executor, and it was dismissed by the Master of
the Rolls, and the decree was affirmed, on appeal to the

Lord Chancellor. Here was a specific bequest of the bonds so pledged, and the money was advanced *at the time* the pledge was made, and upon the credit of it. The Master of the Rolls said, he had found no case where the money had been advanced at the time, to the full value of the assets, that it was ever called back. He admitted that suspicion of fraud must always arise, where a party having a debt due from the executor, takes, in satisfaction of that debt, the assets which he knows belong to the executor, only in that character; but it would not do, to hold, broadly and generally, that no man could advance money upon a bond, or other chose in action of the testator, without implying a fraudulent collusion with the executor to misapply the assets. Lord *Eldon*, on the appeal, went into a very full and accurate review of the cases on the subject, and admitted they were not be reconciled. He declared, that on a sale by the executor, *for money advanced at the time*, the vendee could never be affected by proving the executor's intention at the time to misapply the money, or that he afterwards did misapply it. The third person, if there was no more in the transaction, would be justified in assuming, that the sale was for those purposes for which the law gives the executor the power of sale. In a great variety of cases, the executor may pledge the assets at the hazard, not of the person dealing with him, but of the *cestui que trust.* The true question was, whether there must be fraud by the person dealing with the executor for his own benefit, or if there be direct, or strong and pregnant evidence, that the advance was not what it *prima facie* imports, for a purpose connected with the administration of the assets, but for a different purpose, and that the executor was going to misapply the fund, whether the party could safely deal with him. He, evidently, was of opinion, he could not; and he assented to the observation of Lord *Alvanley*, that there could not be a stronger case of a *devastavit*, than an executor aliening the property of the

<div style="margin">

1823.

FIELD
v.
SCHIEFFELIN

Upon a sale of assets by an executor, *for money fairly advanced at the time,* the vendee can never be made responsible for the misapplication of the money.

</div>

testator to pay his own debts, the alienee knowing at the time, that debts of the testator were due; and he thought that Lord *Mansfield,* in a case already cited, strained too far in favour of the purchaser of the assets.

The last case I shall notice in this point, is that of *Keane* v. *Robarts,* (4 *Madd. Ch. Rep.* 332.) in which legatees and creditors attempted to follow assets into the hands of bankers, who had received them from the executor.   Sir *John Leach* held, that the purchaser from an executor, of a specified bequest, was not bound to inquire into the fact, whether the sale was made necessary by the existence of debts, or for the purposes of the estate ; because he has no adequate means to prosecute such an inquiry.   He held, that the purchaser had a right to assume that the executor sells in the necessary course of his administration ; and that he was not responsible for the executor's misapplication of the money, unless he was a party to the breach of trust.

I have thus looked pretty fully into the decisions in the analogous case of a purchase from an executor of the testator's assets ; and they all agree in this, that the purchaser is safe, if he is no party to any fraud in the executor, and has no knowledge or proof that the executor intended to misapply the proceeds, or was in fact by the very transaction applying them to the extinguishing of his own private debt.   The great difficulty has been, to determine how far the purchaser dealt at his peril, when he knew from the very face of the proceeding, that the executor was applying the assets to his own private purposes, as the payment of his own debt.   The latter and the better doctrine is, that in such a case, he does buy at his peril ; but that if he has no such proof or knowledge, he is not bound to inquire into the state of the trust, because he has no means to support the inquiry, and he may safely repose on the general presumption that the executor is in the due exercise of his trust.

The reasonableness and propriety of the application of this doctrine, respecting the assets of executors, to the case

of guardians of the personal estates of infants, appears to be very apparent, provided it be once admitted that the guardian has a power of disposition of the personal estate, and may exercise it in his discretion, for the benefit of the infant. The purchaser from the guardian has, indeed, less means to pursue the inquiry into the necessity or expediency of the sale, than the purchaser from the executor, because the duty of the guardian is not so clearly marked out, and depends more upon circumstances, as to the judicious and profitable management of the estate, and the suitable maintenance and education of his ward. If the guardian can sell and assign, the purchaser must be protected to the same extent, at least, as the purchaser from an executor, and he certainly can be under no greater obligation to inquire into the propriety of the assignment.

The case then resolves itself into the fact, whether the guardian has misapplied the produce of the bond and mortgage in violation of his trust, and whether the plaintiff was either a party to that fraud, or had information of any such design when he purchased. I have already observed, that the case does not warrant me in drawing the conclusion, that the plaintiff had any such knowledge or information. There is no ground for an inference of fraud, or for the charge of gross negligence. There was nothing special in the transaction, that rendered it the duty of the plaintiff, to make any inquiry as to the object of the sale, and the destination of the fund. He had no means to pursue the inquiry. The evidence does not bring home to him even a knowledge of the dissipated habits of the guardian, as early as when the assignment was made ; and we want also the fact to be more fully and certainly established, that the funds have been actually wasted and misapplied. It is said that the plaintiff had reason to believe it was the intention of the guardian to misapply the fund. I see no other ground for that belief at the time, than the debts which the guardian owed. But, that circumstance does not appear to be suf-

1823.

FIELD
v.
SCHIEFFELIN

ficient to fix a new responsibility upon the purchaser, for it is not shown that the guardian was, at the time, insolvent, or meditated any breach of trust, and it was to be presumed that he had given ample security for the performance of that trust, and that his own concerns would not involve or be permitted to affect the trust estate.

I shall, accordingly, make the usual decree, that the amount due on the bond and mortgage be paid by the defendant, *J. Schieffelin*, within 60 days, or that the mortgaged premises be sold, and that no costs of this suit be charged by either party, as against the other, except that the defendant, *J. S.*, be charged with the cost of the sale, if the sum due be not paid without it.

<div align="right">Decree accordingly.</div>