Brooke, J.
I also concur in the opinion, that the decree must be reversed. But I desire it may be understood, that I do not mean to express any opinion as to the effect of the proceedings in the injunction cause in the county court of Prince William, if those proceedings *428 had been regularly pleaded and exhibited as a part of' the case, so that the court could judicially take notice of them, and decide on the effect they ought to have.
Tucker, P.
It is not alleged, in this case, that there has been any mala fides on the part of the bank; but it has been regarded as accountable for the value of the fifty-nine shares of stock, the assignment of which is alleged to have been improperly permitted by the president and directors, on their transfer book. Its liability, then, is stricti juris. It has received no profit; it has made no advantage; it has committed no wilful wrong. Its fault, if any, has been careless inattention in one of its officers, to a warning not to permit the transfer. From this inattention, the. appellee, or the sureties of his guardian, have been- supposed to have sustained injury, and for that injury compensation is sought. Thus circumstanced, the bank has a right to demand, that the strictness of law which is to render it responsible, should be equally enforced in relation to its adversary, and unless he can bring himself within its requisitions, the bank must be exculpated.
It is conceded also, that, as a general rule, a guardian has power to dispose of the personal estate of his ward, and though personally responsible for so doing, the vendee to whom he sells, is not responsible, if he has dealt fairly and justly, and without notice of any fraudulent intent. Field v. Schieffelin, 7 Johns. Ch. Rep. 150. Indeed, it is often the duty of the guardian to sell, and he will be responsible for permitting what is liable to destruction to waste upon his hands. 3 Salic. 177. This authority abundantly proves, not only the right to sell, but a discretion in the guardian, when to make a sale, though he may render himself indeed, responsible for its improper or injudicious exercise.
With these preliminaries, let us proceed to the inquiry, whether the bank is responsible. And here we *429 may at once, I think, disembarrass the case of all that concerns the bill filed by James Craig as next friend of the infant Lewis Craig, which terminated in a decree ° . for the sale of the stock. For unless it can be shewn, that an act can be justified by matter ex post facto, or that the motive for the action of the bank could be subsequent to that action, the decree of September 1824 cannot be invoked for its protection; since some of the shares w'ere sold and transferred to Withers, before the sale under the decree, and the residue W'ere not conveyed to the purchaser at the sale, or in pursuance of the requisitions of the order. If, therefore,, the transfer be justifiable, it must be on other grounds.
In approaching this subject, it behooves us first to consider, in what light is the bank to be regarded in the transfer of stock ? It is provided, by the act of incorporation, that the stock “ shall be assignable and transferrable, according to such rules and regulations, as shall be prescribed by the laws and ordinances of the bankand, accordingly, certain regulations have been adopted, by which the seller, either in person or by attorney, makes an actual assignment on the transfer book of the bank, in the presence of some one of its officers. Those regulations are designed to insure regularity in this important branch of its business; to ascertain, beyond question, to whom dividends are to be payable; to prevent the possibility, as far as may be, of contending claims for the same stock; and thus to secure the bank against the danger of paying to the wrong person. The bank has no’ agency in the transaction, except to open its books to an assignment upon the face of them, to take in the old scrip, and to issue to the purchaser a new certificate of his title to so many shares of stock. It has no right to interfere further, than to see, that the rules of the bank are complied with; for the right of a party to assign, is independent of the bank, and can only be restricted or trammelled so far as the regula *430 tions, made under the above cited clause of the ehartei, have the effect of limiting and controlling the mode of exercising the right. The bank can impose upon one n0 greater restriction than on another, nor, by the exertion of an arbitrary will, extend, for a particular occasion, those rules, whose validity and use consist in their generality, as laws of the corporation.
How stands the purchaser of the stock ? Like the purchaser of any other article. He confides in the title of the person from whom he buys, and his vendor is bound to the warranty of that title. Medina v. Stoughton, 1 Salk. 210. 3 T. R,. 57. Does he purchase at private sale ? Then he emphatically looks to his vendor. Does he purchase at public sale ? The principle caveat emptor strictly applies. Does he purchase, as is most usual, through a broker ? There the broker is his agent as well as the agent of the seller. If the broker is defrauded, the seller is responsible; if he joins in the fraud, he is answerable himself. In short, in the whole transaction, the purchaser, either by himself or his agent, is the party concerned with the seller. The bank is but the passive instrument of their will, so long as they conform to the established regulations. If, indeed, either party varies from them to the prejudice of the other, and with the connivance of the bank, there might be plausible reason for holding it ultimately liable. But so long as the officer of the bank pursues the law, so long is the bank within the pale of its protection.
The reasonableness of these principles cannot, I think, be denied. The rules and regulations on the subject of transfers, were made, principally, for the security of the company and its stockholders. They were not intended to throw upon the company, that care and caution, which both reason and law require of the purchaser. The bank was not bound to see that transfers were regularly made, and were not bound to make any other rules and regulations than it thought proper. Of course, it was not *431 bound to make such as would throw upon itself the responsibility which otherwise would rest upon the purchaser. It has not done so. It is bound, indeed, to the stockholder, if, without his default, it permits his stock to be assigned over and irrecoverably lost to him. But to the purchaser of the stock, I hold it not bound, even though it be transferred under a forged power of attorney. For the purchaser takes upon himself to dispense with the transfer in person. He or his broker assents to take a transfer under a power. They know from whom they buy. They have the means of ascertaining the fairness of the power. The bank has not. The sale of the stock may have taken place between parties resident abroad,—in other states,—or in distant countries, beyond the Atlantic. It is in such cases, that the transfer by a power is most wanted. How is the bank to be held responsible for the genuineness of a power executed under such circumstances ? Why should it be so held liable, instead of the purchaser, who being upon the spot, receiving the power, and the scrip, from the hands of his vendor, must have the means of ascertaining whether it be valid or not ? If, therefore, it were necessary to decide between the two cases which stand in collision in the english books upon this subject, I should not hesitate to side with sir Joseph Jekyll against lord Northington; though there were, it must be confessed, some grounds in the case of Ashby v. Blackwell, for the opinion of the latter, arising out of the breach of its own rules by the corporation. Nor do I think the analogy of the case of a check either apposite or conclusive. In the case of a check, the cashier is called upon to pay away the funds of the bank. If the drawer has no funds there, it is the folly of the bank’s officer to pay it; whereas the payee is in no default, and therefore he should not be bound to refund, since it would be hard to turn him round to the drawer, who may no longer he solvent. But, if a check be forged and bo *432 paid, though the payment is not good against the supposed drawer, can it be doubted, that the payee who has presented and cashed a forged check, would be compelled to refund ? Now, I take him to be in the situation of the purchaser of stock under a forged power, and not more responsible to refund his ill gotten gains than the latter.
In the case before us, however, there is no difficulty as to the power of attorney. The due execution of the power from James Craig, has been sufficiently established, and that of Fox has not been in the slightest degree controverted. So that, in truth, the case may be considered as if Fox had gone in person to the bank, and had demanded to make the transfers on the transfer book, to the vendee of the stock. Had he done so, could the officers of the bank have refused to permit it? If they could, it must have been, either because the stock belonged to the ward, and could not be transferred by the guardian, which is in the teeth of the law as admitted, and as established by the cases cited, and in opposition to the fact, that the stock stood in his name, and was legally his, and could not even pass to the ward without his transfer; or it must have been, because the officers of the bank supposed a fraud was intended upon-the ward, to which they were unwilling to be accessary. But to concede to the bank the power of permitting, or refusing, the exercise of his legal power by a guardian, would indeed be of serious consequence. It would annihilate the admitted power of the guardian over his ward’s estate; it would arrest the discharge of his duties, and vest the inquiry into his conduct, in the officers of the corporation, instead of the courts of justice; or drive him to his mandamus or other process against the bank, to compel its assent to a trañsfer. This would be most inconvenient and pernicious.. The bank has nothing to do with those official trusts. If the guardian defrauds his ward, his *433 sureties are responsible; if the purchaser combines in the fraud, he too is chargeable; but the bank cannot interfere and arrest the transfer of its stock by the legal holder of the scrip, upon such pretences. It would trammel and embarrass such transactions, so as to impede materially that transferrable character, which is one of the most valuable attributes of stock.
Is there, then it may be asked, no case in which the bank can be justified in arresting the transfer of stock ? Assuredly there are such cases; as if a power of attorney, or the scrip were known to the officer to be forged, the officer would be justified in refusing to permit the transfer. So too, it may be arrested by a restraining order or injunction, made by a court of competent jurisdiction, at the instance of a party interested. But I do not think, that mere knowledge of facts by the president, or any one or more directors, in their individual characters, would make the bank responsible, even though such facts would be a sufficient foundation for a restraining order. Whether an express notice in writing to them, as a corporate body, would suffice, I am not now called upon to decide. When the question is presented, it wifi merit consideration, to what officer of the bank such notice should be given; for though process must be served on the president, I apprehend notice is to be given to that officer within whose appropriate sphere the transaction falls. Thus, if one desire to stop the payment of a check, he must go to the cashier and not to the president; and if he wish to arrest the transfer of stock, he must go to the transfer clerk and not to the book keeper. The president, cashier a,nd clerks, are all officers, and all, I presume, have their various distinct duties and departments; and though the president may have a superintending power over the whole, yet it would be inconvenient unnecessarily to throw upon him the duty of attending to what belongs to others. The party, therefore, who desires to *434 arrest the proceeding, should apply to the proper officer, whom it is his business to know or to find out. It aiso merits consideration, what is to be the course of . . , . r the bank upon receiving such express notice oí a contest about the stock? Must it lie still,—refusing to permit a transfer to one, or to pay dividends to another ? or must it file a bill of interpleader to settle the contest? Is it most reasonable to require the party who wishes the restraint, to institute his proceedings, and procure a restraining order, which the bank must obey, or, to compel the bank to exhibit its bill of inter-pleader for the purpose of settling a controversy in which it has no interest ? The statement of the question furnishes, I think, its own reply.
Be this however as it may, it may safely be affirmed, that a company (whose president and directors can only bind it by a majority of their votes, and whose president cannot bind it alone) can never be subjected to loss by reason of his unofficial knowledge of the transactions of the holders of stock. The mischiefs of such a doctrine would be incalculable; while, on the other hand, few are to be apprehended, from requiring the party, who would arrest a transfer, or charge the holder with a trust, to assert his remedy in the courts, by asking a restraining order.-
We come, then, to inquire, whether there was a restraining order in this case ? To this question the answer must be in the negative. There was indeed an order injoining Fox from selling, but there was no order restraining the bank from permitting the transfer. The indorsement of the clerk was his own act merely. And even if it had been the act of the court, it would have been invalid, as the company were not parties. However technical this may seem, yet the defence is not unreasonable, in a case where it is attempted to charge the stockholders with heavy damages for the mistake or carelessness of one of their officers. It is *435 certainly a legal defence. And moreover, though misr i / i nomer of a corporation is only matter of abatement, where it is plaintiff, 1 Bos. & Pull. 40. 2 Stark. Ev. part 4. pp. 424. 425. yet where it is defendant, I take it to be matter in bar; for the judgment can never be rendered against the company, so as to justify an execution against it. Thus, in the suit in Prince William county court, where the process issued against the president and directors of the Bank of Virginia, although the case now stands on a conditional decree against the bank, it cannot, I apprehend, be made final by a decree against the company, which was not named in the process. There has not, then, been a restraining order against the president, directors and company of the Bank of Virginia.
As to the liability of the bank on the principle of a Us pendens, that is in this case, wholly inadmissible. That doctrine affects the purchaser pendente lite of the corpus or subject of the suit. But the bank here is no purchaser. It has merely opened its books to receive the transfer. Again; the effect of the rule as to the Us pendens, in any case, is to subject the purchaser to the decree which may be rendered in that suit, in favour of that plaintiff, and not to subject him in another suit to another plaintiff.
I am, therefore, of opinion that no one is liable in this suit, but Fox and his sureties. Whether in the Prince William, suit, the purchaser can be made liable or not, is not a matter now before us. The bill should have been dismissed as to the bank, and the cause proceeded in to a decree as to Fox and his sureties.
That decree, I think, it best not to render here, since, under the new aspect presented by the exoneration of the bank, the sureties may find it necessary to take some further steps as to the account; and the plaintiff himself did not ask such a decree at the hearing in the circuit superiour court, and the court disclaimed *436 deciding on the extent of the accountability of the sureties.
Accordingly, a decree was entered, reversing the decree of the circuit superiour court with costs, dismissing the bill as to the bank, and remanding the cause, to be further proceeded in as to the other defendants.
But, the next day, Stanard shewed, that the reports of the commissioner ascertained the exact state of Fox’s guardian’s account, and furnished materials, by which the court could readily ascertain the precise amount of debt due from Fox to his ward, and for which he and his sureties were liable; and as Fox, and his sureties in both his guardian’s bonds, were all before the court, and as the court of chancery had decided, that the sureties in the second guardian’s bond were responsible for Fox’s acts, though it did not determine the extent of their liability,—he asked the court to make such decree presently, as the court of chancery ought to have made. Upon which the court set aside its first decree and entered another
Decree, reversing the decree of the circuit superiour court with costs, and dismissing the bill as to the bank; and decreeing further, that Fox, the guardian, and Hooe the surviving surety in his second guardian’s bond, and the administrator of Dickinson the deceased surety in the same bond, de bonis testatoris, should pay the appellee 8674 dollars with interest from the 1st January 1833, and his costs in the court below, and that the appellee should pay the defendants Claytor, J. Fox and the administrator of Rennoe, sureties of Fox in his first guardian’s bond, their costs in the court below.
The court itself adjusted the accounts, and ascertained the balance which was decreed; and in doing so (as the reporter was informed) it charged the guar *437 dian and his sureties, with the value, at the date of the decree of the court below, of the fifty-nine shares of stock, which the guardian had appropriated to his own use, and the amount of dividends thereon accrued from January 1825, inclusive; and it allowed no credit for commissions on the value of the stock, but it allowed commissions on the amount of dividends. It charged them also, with profits of slaves of the ward received by the guardian, with 2532 dollars received by him from James Craig, the former guardian, and with 576 dollars received by him from the representative of the ward’s father, in 1825 and 1826; that is, subsequently to the order of the county court of Prince William of October 1824, revoking the previous order appointing him guardian. And it credited them with all disbursements of the guardian for his ward, whether made before or after the guardian’s appointment was so revoked, with 2551 dollars received by the ward in September 1828, and with commissions on the amount of this payment and the disbursements, and (as before stated) on the dividends of the stock.
Whence it appeared, that the court was of opinion, 1. That in case of a guardian selling his ward’s bank stock, with design to appropriate, and appropriating, the proceeds of sale to his own use, he and his sureties are bound to replace the stock, or its equivalent, and account for the dividends on it: 2. That, in such case, no commission should be allowed on the value of the stock, but commissions shall be allowed on the dividends. And 3. that the order of October 1824, revoking the guardian’s appointment, upon the rule of his sureties for counter security, without summons to the guardian, or appearance by him, was a proceeding not warranted by law, and was void, at least as to persons dealing with the guardian without notice of such revocation.
*438 in April 1836, Walter Jones moved the court, to set aside the decree for 8674 dollars with interest &c. against ^ox an<^ ^is sureties in his second guardian’s bond, and to reinstate the decree first entered, merely dismissing the bill as to the bank, and remanding the cause for further proceedings,—on two grounds: 1. That the decree finally entered, was wrong in charging the sureties with the bank stock &c. since Fox had sold the stock, riot in virtue of his authority as guardian, but as commissioner of the court of chancery of Fredericlcsburg: and 2. that, as the court below had made no decree against Fox’s sureties, but, on the contrary, had expressly declined to ascertain the extent of their liability; and as this court, upon the appeal taken by the bank, could only review and correct the actual decree of the court below; therefore, the question as to the amount for which the sureties were hable, was coram non judice ; the court had no jurisdiction to decide that part of the case 5 it had exercised original jurisdiction; neither had the sureties Nbeen heard here. And he took this distinction—that though a decree made in a cause and between parties before the court, and which the court had jurisdiction to make, could not be set aside at a subsequent term, yet a decree made in respect to matters or parties coram non judice,—a decree, in other words, which the court had no jurisdiction to malte,—might be set aside at a subsequent term.
Stanard said, there was no such distinction: that the court could no more set aside a decree of a former term for error upon a point of jurisdiction, than for error on any other -point. And Johnson said, the rule was, that the court would set aside a decree or judgment of a former term, if it was entered when the party was dead, or when, having retained counsel, he was nevertheless, through any accident or mistake, not heard by his counsel ; but it was not competent to the court to set aside any decree of a former term, made inter partes. The *439 appeal taken by the bank brought the whole case before this court: it especially brought Fox’s sureties before this court; for the decree of the court below decided, that the sureties were ultimately liable, but the bank was primarily liable, for the bank stock; and that was a question, in which the sureties were principally interested. It was their own negligence, that they were not heard by counsel here; it was not pretended, that they had retained counsel. This court, reversing the decree of the court below against the bank, had only proceeded to make such decree as that court ought to have made; which was according to the usual and settled course.
The court overruled Jones’s motion, on the ground, that it could not now set aside the decree entered at the former term, whether it was prematurely entered, or whether it was objectionable on its merits, or not.