JAMES W. BAUGHN v. CHARLES SHACKLEFORD.

1. TRUSTS—GUARDIAN AND WARD.—Nothing will discharge securities for a debt due to wards, but the payment of the money. Wherefore, an agreement between a guardian and one of the partners in a drug store, who was indebted to the wards, and whose debt was secured by statutory lien and personal security, to credit the amount of the guardian's individual liability to drug store firm on debt thus due and secured to the wards, is held to be in violation of the guardian's trust, and void as to the rights of the wards. And the like principle prevails, of course, where an agent of the guardian attempts to have his own liability canceled by the cancellation of a like sum upon securities held by the guardian in favor of the wards.

2. SAME—PAYMENTS OF MONEY TO GUARDIAN'S AGENT FOR THE CUSTODY OF WARDS' SECURITIES.—A guardian, being absent in the Confederate army, in 1863, left a note, held as security for money due the wards, with his brother, to whom, during the guardian's absence, the debtor applied and made a partial payment, which was credited on the note. Four months after the guardian returned, he was informed of the payment, and accepted the money without objection. *Held,* that the length of time raises a presumption of ratification or acquiescence in the action of the custodian of the note, and that the payment was valid, and this, though the relation of principal and agent is not clearly shown to have existed.

APPEAL from the chancery court of Madison county. HOOKER, Chancellor.

The facts fully appear in the briefs of counsel and in the opinion of the court.

The appellant assigns errors as follows :

1. The court erred in disallowing the payment of $623.24 made on 1st February, 1861, and charging the property with the payment of that sum and interest.

2. The court erred in disallowing the payment of $775.26, paid to James S. Reid on the note for $1,155.55, and in charging the property with the payment of that sum and interest.

3. The court erred in disallowing the payment made to Sansom, as guardian, etc., as to the sum of $791.36 so paid, and in charging the property with the payment of that sum and interest.

4. The decree charges the property with the payment of $2,353 in favor of Florida Lewis, and $1,251.76 in favor of Orlena Shackleford and husband.

*John Handy*, for appellant.

1. The first error assigned is the holding of the property bound for the payment of the $623.24, paid to James S. Reid on the first day of February, 1861.

It is manifest from the facts that the good faith of the parties was " *omni exceptione major.*" The facts furnish not the least ground for a speculative charge against Reid or Baughn. Reid was able and willing to pay what he owed Baughn, whether Baughn appropriated the money to the debt of Baughn to Reid as guardian, or not. If Reid had paid Baughn's accounts, and Baughn had immediately handed him back the $623.24, no contest could ever have arisen about the sufficiency of the payment ; and such was, in substance and effect, what was done ; the form of the transaction

cannot vary its legal effect.  It is not a case of Reid's paying his private debt with the assests of his wards; the form of the transaction was a matter of indifference to him; he gained nothing personally by it.  He immediately charged himself, as we have seen, with the amount.  He could have done no more if he had never owed Baughn a cent, and Baughn had paid him by counting out the gold.  The interests of the wards are to-day just where they would have been if the gold had been counted out and paid by Baughn to Reid, and Reid had never owed Baughn one farthing.

I admit that, in all cases where there is the least ground for suspicion of speculation or conversion on the part of the trustee, the law will avoid the transaction as against its principles and policy; but where, as in the present case, the *uberrima fides* is admitted, the severe rule does not apply.  A trustee himself shall never be allowed to gain advantage or profit by the administration of his trust.  If he deposit trust funds in bank in his own name, he shall, perhaps, be held responsible if the bank should break; because here is gain to himself personally by the credit given to him by the deposit.  He may not purchase the trust property at his own sale, because the relations of seller and buyer are inconsistent and antagonistic; the law, for reasons of public policy, puts "the sting of disability" into the transaction by absolutely avoiding the sale, at the election of the *cestui que trust*.  But this strict rule of policy is applied to no other act of a trustee, to the extent of absolutely avoiding it, not even to that of a purchase by the trustee from his *cestui que trust*.  The courts will sift them severely, but if found free from any suspicion of unfairness or wrong, will sustain them in spite of the objection of the *cestui que trust*.  Jones v. Smith, 33 Miss. 215.

This is not the case of a debtor paying to the agent of the creditor in a bad, slow or doubtful debt of the

party paying it (in which case the *mala fides* would be apparent), for Reid was entirely solvent and punctual, willing to pay Baughn at any time, and what he owed Baughn is agreed to be "equal to cash."

The next error assigned, is the refusal of the court to credit the sum of $775.66, paid on Kirkpatrick's note for his purchase of the property.

Now, admitting that Dr. Reid had no authority to receive the money on the note, the conduct of James S. Reid, after his return, certainly fully ratified or adopted the act of his brother. The principal must repudiate the unauthorized acts of his agent within a reasonable time after being informed of them. Burns v. Kelly, 44 Miss. And its disaffirmance should be notified to the party whom the principal intends to hold responsible. Ib. It is not sufficient to respond that Dr. Reid had no authority to receive the money; that he was a mere depositary of the note, for the maxium of Coke is that "a subsequent satisfaction has a retrospective effect and is equivalent to a prior command." Broom, 775. Broom says, that "the subsequent assent by the principal to his agent's conduct, not only exonerates the latter from the consequences of a departure from his orders, but likewise renders the principal responsible on contracts made in violation of such orders, or even where there has been no previous retainer or employment, and this assent may be inferred from the conduct of the principal." Dr. Reid was the agent of his brother, James S. Reid, to a certain extent, at least, in reference to the custody of the note. He was certainly agent for its being kept in safety, although he doubted his authority to receive payment.

"Long acquiescence without objection, and even the silence of the principal will, in many cases, amount to a conclusive presumption of the ratification of an unauthorized act. * * * Thus, for example, if an agent without authority should compromise a debt of

his principal, who, after. knowledge of the fact, should make no objection but acquiesce for a length of time in the act, he would be held bound by it." Story on Agency (Bennett's ed.), § 255. And " even if no prior relation of principal and agent has existed between the parties, yet if a party who has acted for another gives notice thereof to the principal, and the latter makes no reply or no objection, it will, in many cases, afford a presumption that he ratifies the act." Ib., § 258. Mr. Livermore seems to doubt the extent of this rule as stated by Judge Story, but does plainly assert that the doctrine does apply to all cases where the party assuming to act is not a mere intruder or intermeddler without any color of authority. See note 4 to Story on Agency, same ed., p. 288, being note to § 258, where the views of Livermore are stated and disapproved by the annotator.

The payment of the money to the custodian of the note, and the guardian's subsequent receipt of the money without objection, and by his silent acquiescence for years in its payment, was a full ratification of that transaction. 9 Cranch, 153; Peters C. C. 496; 3 Wash. C. C. 151; 2 Woodbury & Minot, 217; Chitty on Cont. (10th Am. ed.) 233, and cases cited; 2 Johns. Cas. 424; Crane v. Bidwell, 25 Miss. 507; Livermore, 427; Paley, 33.

3. The third error assigned is the refusal of the court below to allow the credit of $791.96 paid by Baughn to Henry Sansom, guardian of Orlena. Lewis, through C. C. Shackleford, Sansom's agent.

The note on which this payment was made was for $842.40, dated 9th November, 1861, due 1st January, 1862. This note was given by Baughn for what was found due from him to Orlena Lewis, or rather to Sansom, her guardian, on a settlement between Baughan and Sansom.

Now, if Baughn had paid the whole of the Sansom

note to Shackleford, directly in money, no question could ever have arisen as to the complete satisfaction of his note. We think the effect is the same as if the transaction was actually done. Baughn had proposed to Sansom to pay him the money. Sansom's reply was, not simply pay it to Shackleford, he is my attorney in fact, and has the note, but he adds that " any arrangement you make with Mr. Shackleford will be perfectly satisfactory." Shackleford's authority to settle the matter was plenary. It was impossible to make it more full and general. The parties all stood in peculiar relations to each other. Shackleford, the agent, was also surety on the bond of Sansom as guardian of Orlena Lewis. Shackleford had taken her into his family, and had supported and educated her—that she remained a member of his family from 1855 until 1862.

The facts show the utmost good faith on the part of Baughn; and Sansom and Shackleford should be left to settle the matter with themselves, and to respond to the demands of Miss Lewis, now Mrs. Chas. Shackleford. This would meet the full justice of the case. If one of two parties must suffer, he ought to suffer in preference, who has, by his conduct, misled the confidence of another into an unwary act." Livermore on Agency, 75; ib. 443.

It is certainly a good general rule that a trustee ought not to mix up his private matters with those of the *cestui que trust*; yet when there is no ingredient of personal interest or advantage, or suspicion of fraud on the part of the trustee, when the *uberrima fides* appears, there is no reason why the innocent should be made to suffer. The prohibitory policy of the law, as to guardians mingling their own affairs with those of the wards, does not apply to third persons dealing with the guardian. Merrill v. Jones, 4 Miss. 565. In that case the court say : " If the agent act unwisely or faithlessly, that will not affect the title of a party purchas-

ing from him, unless it be shown that the purchaser himself has been guilty of some fraudulent misconduct."

In Doe v. Fallows, 2 Cromp. & Jervis Ex: R. 481, Bailey (Baron) said : " An executor may make an effectual disposal of the assets in consideration of a debt of his own, and to discharge his own debt, if there be no fraud in the creditor."

In Joor v. Williams, 38 Miss. 546, the court of appeals said that a third person, dealing with a trustee, through violation of duty on the part of the trustee, must have notice or knowledge of the violation of duty. Now Baughn had no such notice. If the peculiar relation and situation of the parties already mentioned had not existed, or if Sansom had simply replied to him, pay the money to Shackleford, my agent, who has the note, B. might be chargeable with notice; but Baughn was thrown completely off his guard by the letter of Sansom, saying " any arrangement" S. would make would be " perfectly satisfactory." The case therefore is not within the prohibitory policy of the law, seeing that Baughn cannot, under the circumstances, be charged with any constructive notice of impropriety, both by reason of the peculiar circumstances and situation of the parties, and the invitation of Mr. Sansom to arrange the matter as Shackleford might desire.

*J. A. P. Campbell*, for appellees.

I. As to the payment of $623.24. This was effected by receipting to Reid, for his individual indebtedness to that amount to Cassell & Baughn, in consideration of which Reid credited Baughn with that sum on his note for the purchase money of the land sold by Reid as guardian. True, Reid was then solvent and punctual, but in taking his own debt as a payment of money due to him as guardian he misapplied the trust fund, and Baughn aided him to do it. If Reid had paid to Cassell & Baughn his indebtedness to them, and

Baughn had immediately paid it to Reid on the note, it would have been valid. But it has been found necessary to guard rigidly against the bare appearance of a fiduciary treating the trust fund as his own, and dealing with it for his own purposes, and the uniform course has been to affect with fatal consequences him who, with full notice, deals with the fiduciary in this way. Prosser v. Leatherman, 4 How. 237; Miller v. Helm, 2 S. & M. 687; Scott v. Searles, 14 ib. 94; Booyer v. Hodges, 45 Miss. 78; Crane v. Drake, 2 Vern. Ch. 616; Wilson v. Doster, 7 Ired. Eq. 231.

II. The payment of $775.66 to Dr. Wm. M. Reid was not valid. He was not authorized to receive payment, and so told Baughn, and refused to give up the note. The deposit of the Confederate money with him was at the instance and the risk of Baughn, who did not himself consider that he had thereby paid the note, for he left it in the hands of Dr. Reid, who was his bailee of the money. Dr. Reid was not the agent of James S. Reid, and did not profess to act as such in this matter, but received the money at the instance of Baughn, wherein this case is precisely like that of Burns v. Kelley, 41 Miss. 339.

III. The payment to Sansom, through Shackleford, by discharging a debt of Shackleford to Madison county, was not valid, for it was not within the scope of the authorization by Sansom, and, if it had been, was so palpable a violation of the duty of Sansom, as guardian, as not to have protected Baughn, who dealt with him with full knowledge of the fact that the money of the ward was thus applied to the individual purposes of the guardian, or his agent.

Baughn has his remedy against Reid and Sansom or Shackleford, and must look to them; but whether he has or not, he knowingly assisted fiduciaries to convert trust funds to their own use.

The land was bound for the purchase money until it was paid. The three payments were invalid as to the wards, and they had a right to resort to the land for what was due them respectively on it.

It matters not that Reid, as guardian, charged himself with any of these payments, long afterward, in settlement with the probate court, and that the court decreed that he should pay such to his ward. The ward did not get the money after decree, as will be assumed, since, if she had, that would have barred the suit *pro tanto* against the land.

But there was no payment, and the pretense is, that a decree charging Reid with the money, in settlement with the probate court, answers instead of payment to bar the wards.

The ward was willing to have it decreed to her, and was anxious to receive it from any source, but did not, and Baughn can claim nothing because his friend, the guardian, sought to serve him by charging the sums received from Baughn in his accounts. Charging and decreeing are quite distinct from paying the money. Because it has never been paid, the purchase money of this land has been sought to be charged upon it in the hands of Baughn, who, as a purchaser at guardian's sale, holds it bound for purchase money until it shall be paid. Perry on Trusts, §§ 225, 835; Field v. Schiefflin, 7 John. Ch. 150; Petrie v. Clark, 11 Serg. & Rawle, 388; Williamson v. Morton, 2 Md. Ch. 94; Garvard v. R. R. Co. 29 Penn. St. 154; Williamson v. Bank, 7 Ala. 906; Shaw v. Spencer, 100 Mass. 388; 13 Allen, 50, 407; 3 ib. 217; 12 Wheat. 498; 2 Brock. 185; 6 Call, 308; 4 Ohio St. 445; 7 Ired. Eq. 231; 14 Ves. 362; Crane v. Drake, 2 Vern. Ch. 616; Kean v. Robards, 4 Maddox, 357; 8 Ves. Jr. 207; 17 ib. 155; Hill v. Simpson, 7 ib. 152; Dodson v. Simpson, 2 Rand. 294; 1 Story Eq. Jur., §§ 422, 423, 424.

SIMRALL, J.:

This appeal is prosecuted to determine whether certain credits claimed by the appellant, and refused by the chancery court, ought to be allowed to him.

James S. Reid, guardian of Orlena and Florida Lewis, infants, under the decree of the probate court of Madison county, in 1858, sold the real estate of his wards on a credit of twelve months. James W. Baughn became the purchaser of one parcel at $1,444.44, and J. W. Kilpatrick purchased another lot for $1,155.56. Notes with personal security were given. The deed to the purchasers recited that the statutory mortgage was retained. Baughn and Kilpatrick also executed to Reid a mortgage, with power of sale, as a further security. Subsequently, Kilpatrick sold the lot bought by him to Baughn.

These wards having married, this bill was brought by them and their husbands to enforce against the lands in the hands of Baughn a balance of the original purchase money claimed to be due. The controversy is, how much, if anything, is due the complainants. The complainants assert that certain credits which appear to have been made upon the notes of the original purchasers to their guardian were not a legal discharge *pro tanto*.

First, as to the credit of $623, made by Baughn to Reid in 1861. Reid was the debtor of Cassell & Baughn, druggists, and the arrangement was that Reid should pay his debt to the firm, of which Baughn was a partner, by giving to Baughn a credit on his note to Reid as guardian, which was accordingly done. Reid was then entirely solvent. Reid, in his annual account, charged himself with this collection and interest thereon. The "agreed case" concedes that both parties to this transaction were actuated by good faith, and that no wrong was meditated or intended by either to the wards.

Judicial tribunals are bound to administer justice according to rules prescribed beforehand by the supreme power; and although those rules, in exceptional cases, may work hardship, greater mischief would ensue if they were dispensed with and each case decided as might seem right and just to the court. The law prescribed the duties of the guardian; if he departed from them with ever so honest an intent, he exceeded the powers with which he was intrusted, and the evil, if any, should not fall upon his wards. The highest safety of the interests of wards requires that the guardian shall be held to a rigid adherence to his trust. In this instance, he converted the real estate of his wards into money. The statute under which he acted was especially cautious to insure the best price, by directing the sale to be on a credit, and was exacting that the debt should be secured beyond peradventure for that purpose, raising a statutory lien on the property, in addition to the personal obligation of the purchaser with sureties. This was the character of the debt when the exchange of credits between Baughn and Reid took place. That transaction, if it be permitted to stand, canceled *pro tanto* the statutory mortgage and the personal obligation of Baughn and his sureties, and substituted for the benefit of the wards the simple personal responsibility of Reid and the sureties on the bonds. Nothing will warrant an advancement or discharge of the wards' security short of payment of the money. Hoggatt v. Wade, 10 S. & M. 106. This arrangement canceled the personal debt of Reid to Baughn and his partner, in consideration of a credit of like amount on the debt of Baughn to the wards. In principle, it is like the case of Leatherman v. Prosser, 4 How. 237, where the credit of an estate was assigned in liquidation of the private debt of the executor. The mistake made by the guardian here, and often made, is the assumption that he has the same extent of authority to deal with

the assets of his wards as with his own affairs. These notes were the property of the wards; the debt was due to them. The guardian was the trustee constituted by the law to collect and appropriate it for their use.

The principle has often been recognized that this sort of trustee cannot discharge the debt or the statutory mortgage to the prejudice of the *cestui que trust,* except upon the terms of receiving payment. Elliott v. Connell, 5 S. & M. 106; David Pressley, county superintendent of education v. Martha A. Ellis and W. H. Ellis et al. MSS. opinion, where the cases cited are collected. If the guardian had transferred to Baughn the assets of his wards in payment of his private debt, it would not be doubted, if the assignee had notice of their character, that he would take no title as against the wards. Such a transaction would be illegal and fraudulent in law. Petrie v. Clark, 11 S. & R. 388; Field v. Schiefflin, 7 Johns. Ch. 155. The effect is precisely the same where the guardian credits the debt of the ward with the amount of his indebtedness to their debtor. There was no error in disallowing this credit. We think the transaction between Baughn and C. C. Shackleford, agent for Sansom, the then guardian, of the same character substantially. The money, instead of being paid to Shackleford, on account of the wards' debt, was applied to take up Shackleford's indebtedness to Madison county.

The payment made by Kilpatrick of $775.66, on the 15th September, 1863, stands upon a different footing from either of the others. James S. Reid, being in the Confederate army, left Kilpatrick's note with his brother, Dr. W. M. Reid. Kilpatrick applied to Dr. Reid to make this payment. The doctor doubted his right to receive the money, but did so, and entered the credit on the note. Four months after this, James S. Reid returned to Canton; his brother informed him what he had done; James S. made no objection, but

received the money and the Kilpatrick note.    No steps were ever taken afterwards by James S. Reid to repudiate the transaction.

It would not be disputed if the guardian in person had received the money from Kilpatrick on the 15th of September, 1863, that it would have been a good partial discharge of the debt.    In his absence in the army, the note was placed in the hands of Dr. Reid, his brother; whether simply for custody, or collection also, Dr. Reid was doubtful.  Four months after receipt of the money, James S. Reid accepted it from his brother, and the note credited by it.    Manifestly, if he disaffirmed the act, either because his brother proceeded without authority; or because the money was what is called "Confederate money," or for both reasons, it was his plain duty to have promptly notified Kilpatrick, and returned to him the money. Thomas v. Todd, 6 Hill (N. Y.), 340.  Dr. Reid was not an intruder, thrusting himself into a business in which he had no concern.    The scope of his authority in his own estimation was doubtful; he resolved in favor of his right to receive the money.    The principal manifestly, by accepting the money, and the note credited with it, either acquiesced in the construction which the agent put upon his authority, or confirmed and ratified what had been done for him.  A subsequent ratification, with full knowledge of the facts, is equivalent to an original authority.    Pickett v. Pearsons, 17 Vt. 478, is much like this case; there as here, depreciated money had been collected by an agent, and received by the principal under protest, "that he would see what would be done with it;" he retained it two or three months before he decided to repudiate it.    It was held, however, that he was bound to make inquiry in a reasonable time, and was bound by his delay.    In other words, his conduct amounted to an acquiesence.

Whether Dr. Reid had original authority or not to

receive the money, a subsequent ratification of his act, by accepting it from him, as collected on the note, is conclusive upon James Reid. The acquiesence of the principal will be presumed from the lapse of time, although the strict relation of principal and agent does not exist, " as where there are peculiar other relations as that of father and son." The presumption of a ratification will become more vehement, and the duty of disavowal on the part of the principal more urgent when the facts are brought to his knowledge. Story on Agency, § 286.

We think that this credit ought to have been allowed. There is error in the decree in disallowing. Wherefore, the decree is reversed, and cause remanded for further proceedings, in accordance with these views.