## Case No. 8,580.

### LOWRY v. CANAL BOAT.

[See Case No. 8,582.]

## Case No. 8,581.

### LOWRY v. COMMERCIAL & FARMERS' BANK et al.

[Taney, 310:[1] 3 Am. Law J. (N. S.) 111; Brunner, Col. Cas. 331; 6 West. Law J. 121.]

Circuit Court, D. Maryland. April Term, 1848.

EXECUTOR—BEQUEST OF BANK-STOCK—PLEDGE FOR INDIVIDUAL DEBT—NOTICE—TRANSFER OF STOCK —LIABILITY OF BANK FOR IMPROPER TRANSFER —LIABILITY FOR TESTATOR'S DEBTS.

1. Bank-stock was bequeathed to the testator's executors, and the survivor of them, to pay the dividends to one for life, with remainder over; and the executors were, by a decree in chancery. directed to hold the same in trust to pay the dividends to the devisee for life, and after her death, to divide the stock between those in remainder. The testator died rich; and several years after his death, and after all his debts were paid, one of the executors pledged the stock, which was still standing in the testator's name, to another bank to secure his individual debt; the debt being afterwards paid. the stock was transferred to T. J. & Co., one of the executors being the sole member of that firm, and was by him re-transferred into the names of himself and his co-executor, as executors. Afterwards he, signing his name as acting executor, again pledged the stock to the said bank, to secure other debts of the firm of T. J. & Co.; and a note. for which said stock was.held in pledge. not being paid, in consequence of the failure and entire insolvency of the firm of T. J. & Co.. the stock was sold, and the proceeds applied to its payment. leaving a balance in the hands of the bank. The last dividend on the stock, before it was sold, was received and retained by the bank; but the other dividends, which accrued whilst the stock was in pledge, were received by the said executor; those first received were paid over by him to the legatee for life. but the others were not. On a bill filed by the legatee for life. who was an alien residing in Ireland. to recover the dividends due to her. *held:* That as the bank, to whom the stock was pledged. paid a valuable consideration for it, and had no notice. actual or constructive, of any violation of trust. upon which the transfer could be impeached in equity, it had a right to sell the stock for the payment of the note for which it was pledged, and to make the purchasers a valid title.

2. Purchasers of stock are not bound to look beyond the certificate, or to examine the books of the corporation, to ascertain the validity of the transfer.

[Cited in Pratt v. Taunton Copper Co., 123 Mass. 112.]

3. But the corporation whose stock is transferred. is made the custodian of the shares. and is clothed with power to protect the rights of every one from unauthorized transfers. It is a trust placed in its hands for the protection of individual interests. and like every other trustee. it is bound to execute the trust with proper dili-

1 [Reported by James Mason Campbell, Esq., and here reprinted by permission.]

gence and care; and is responsible for any injury sustained by its negligence or misconduct.

[Cited in Thurber v. Cecil Nat. Bank, 52 Fed. 514.]

[Cited in Cleveland & M. R. Co. v. Robbins, 35 Ohio St. 500.]

4. As the corporation appoints the officers before whom the transfers of stock must be made, it is responsible for their acts, and must answer for their negligence or default, whenever the rights of a third person are concerned.

5. By the law of England, and it would seem, of Maryland. also, before the act of 1843, c. 304 (which does not apply to this case). an executor may sell or raise money on the property of the deceased, in the regular execution of his duty, and the party dealing with him is not bound to inquire into his object, nor liable for his misapplication of the money.

[Cited in Loring v. Salisbury Mills, 125 Mass. 151.]

6. But if a party dealing with an executor has. at the time, reasonable ground for believing that he intends to misapply the money, or is, in the very transaction. applying it to his own private use. the party so dealing is responsible to the persons injured.

[Cited in Duncan v. Jaudon, 15 Wall. (82 U. S.) 175.]

[Cited in Carter v. Manufacturers' Nat. Bank, 71 Me. 453.]

7. In this case. the rights of stockholders and persons interested in its stock were placed by law under the guardianship and protection of the bank, so far as concerned the transfer on their books.

8. If these officers, at the time of the transfer, had reason to believe that the executor, by the act of transfer, was converting this stock to his own use, in violation of his duty, then the bank, by permitting the transfer knowingly, enabled the executor to commit a breach of his trust, and upon principles of justice and equity, is as fully liable as if it had shared in the profits of the transaction.

[Cited in Jaudon v. National City Bank, Case No. 7,230.]

9. The transfer having been made by one of the executors. his character of executor, of itself, was notice that there was a will open to inspection upon the public records; the bank, therefore, when the transfer was proposed to be made, was bound to take notice of the will, and is chargeable to the same extent as if it had actually read it.

10. This stock. although specifically bequeathed, was liable to be sold to pay the testator's debts; and if the bank did not know, or had no reasonable ground for supposing, that the executor was misapplying the assets, it would not be responsible. notwithstanding its implied knowledge of the will.

11. The bank is equally chargeable for the neglect or omission of duty of the officer to whom it had committed the superintendence of the transfers of stock. as for the neglect or omission of its president; and such officer is also equally chargeable with implied notice of the will, and equally bound to refuse the transfer. when he saw that the executor was using this stock in violation of his trust as executor.

12. In the case of Allender v. Riston. 2 Gill & J. 86. the opinion of the court would seem to have been that. notwithstanding the act of 1798. § 3, an assignment by the executor. for his own debt. would be valid against the creditors of the estate, unless there were collusion with the executor; but the case was not decided on that point. nor does the opinion of the court apply to an assignment of property specifically bequeathed.

13. The proposition of one of two executors (the other executor not uniting in the transfer) to transfer this stock, so long after the death of a wealthy testator, without first obtaining an order from the court to justify him, must have satisfied any man of common experience in business, that he was grossly abusing his trust.

14. A bank or other corporation is bound by the same obligations. moral and legal (when the rights of third parties are concerned). that apply to the case of an individual, unless explicitly exempted by law; and if an individual. who confederates with an executor and assists him in defrauding his cestui que trust. is liable to the party injured. there can be no reason why a bank, which knowingly enables an executor to convert the property of the cestui que trust to his own private use, should not be equally responsible.

15. Under the act of 1798, § 3. an order of the orphans' court, for the sale of the stock, would protect the bank from all responsibility.

16. Another bank being induced, relying on the certificate of stock, to loan its money upon it. without knowledge that the stock had ever belonged to the testator, or been transferred by his executor. the stock cannot be followed in its hands, or in the hands of those to whom it afterwards sold it, and be charged with the trusts created by the will.

17. The complainant's claim being merely for dividends on the stock, and not for the stock itself, and this court's jurisdiction over the case being based on the alienage of the complainant; it cannot do what the facts would otherwise warrant, and decree in favor of those of the defendants who are entitled to the stock after the complainant's death; although the court would be authorized to do so, if the complainant's interests required it.

This bill was filed on the 10th of February, 1847, by Maria Lowry, an alien and subject of the queen of the United Kingdom of Great Britain and Ireland, stating that Talbot Jones, deceased, of Baltimore, who was her brother, gave and bequeathed by his will, with other things, two hundred and eighty-two shares of stock in the Commercial and Farmers' Bank of Baltimore, to his sons Samuel Jones, Jr., and Andrew D. Jones, and the survivor of them, in trust, among other things, to pay over the dividends thereof to the complainant for the term of her natural life, and after her death to her daughter Mary (since deceased) for her life. That the testator appointed his said sons his executors, to whom letters testamentary were granted some time in the year 1834, after which, some time in the year 1840 or 1841, a bill was filed in the chancery court of Maryland by Michael S. Norman, the guardian of Wm. B. Norman, a minor, and by said Wm. B. Norman, against the said trustees and others, and on the 6th of November, 1841, by a decree passed therein, it was, amongst other things, decreed that the said trustees should hold the two hundred and eighty-two shares of stock aforesaid, in trust to pay the dividends thereof to the present complainant, Maria Lowry, for her life, and after her death, to hold ninety-four shares thereof, in trust for Emily J. Albert (the wife of Wm. J. Albert), according to the will of the testator, and transfer the remaining quantity of one hundred and eighty-eight shares to Josiah Jones, of Frederick county, and to the

said Wm. B. Norman, in equal moieties. That the said two hundred and eighty-two shares of stock continued in the name of the testator upon the books of the Commercial and Farmers' Bank, from the testator's death, in the year 1834, up to the month of May in the year 1842; on the 4th day of which month, they were transferred upon said books to the Merchants' Bank of Baltimore by the said Samuel Jones, Jr., professedly as executor aforesaid, but actually in violation of his duty as such. That on the 17th of June next following, the said Merchants' Bank transferred two hundred and eighty-two shares of the same bank stock, upon the books of the Commercial and Farmers' Bank into the name of Talbot Jones & Co., which was, at that time, the commercial style and name of the said Samuel Jones, Jr. That said Talbot Jones & Co., on the 20th day of the same month, transferred two hundred and eighty-two shares of the stock of said Commercial and Farmers' Bank, upon the books of said bank, into the names of Samuel Jones, Jr., and Andrew D. Jones, executors of Talbot Jones, deceased; and that said Samuel Jones, Jr., on the 17th of August next ensuing, describing himself as the acting executor of Talbot Jones, deceased, and professing to act for both executors of said deceased, transferred, by his sole act, to the Merchants' Bank aforesaid, the said two hundred and eighty-two shares of Commercial and Farmers' Bank stock, which it has held ever since, receiving from time to time the dividends thereon, when declared and paid by said Commercial and Farmers' Bank. That the shares of stock so as aforesaid transferred to the said Merchants' Bank, were by it received from the said Samuel Jones, Jr., and that it dealt alone with him in both transactions, and took his individual title only to said shares of stock, and that the complainant knew of no consideration given by the said Merchants' Bank, for either of said transfers, to the said Samuel Jones, Jr., and therefore charged that there was none, or if there were any, she charged that there were other securities lodged with it by said Jones, abundantly sufficient to make it safe without resorting to said shares of stock; and that she gave notice of her claim upon said shares of stock, and of the real title thereto, to the said Merchants' Bank of Baltimore, and charged that Daniel Sprigg, the cashier of the said bank, was aware, at the time of both of said transfers, of the said decree in chancery, and of the identity of the stock there mentioned with that transferred to the said Merchants' Bank; and that at the time of said transfers, the president and one or more of the directors and officers of the Commercial and Farmers' Bank knew the contents of the will of the said Talbot Jones, and the existence of the decree aforesaid; and that said Talbot Jones had been dead many years, and that any debts he might have left behind him had been settled long before the year 1842; and that the co-executor and co-trustee of said Samuel Jones, Jr., was a resident of Baltimore and doing business therein. That the dividend declared by the said Commercial and Farmers' Bank, payable in November, 1845, upon said two hundred and eighty-two shares, was $197 40, and that payable in the year following was $394 80, no part of which had been received by the complainant; that she first heard of the transfer of said shares in October, 1846; that Andrew P. Jones died in August, 1846; that Samuel Jones, Jr., was insolvent; and that William B. Norman was under age, and Daniel Sprigg was his guardian. That the said transfers of the 4th of May and 17th of August, 1842, were made by the president and directors of the Commercial and Farmers' Bank in violation of a by-law of said bank upon the subject of transfers by executors and others holding stock in a fiduciary character, and with notice of said shares being held only in a fiduciary character by said Samuel Jones, Jr., and Andrew D. Jones, and of their being used for his own benefit by said Samuel. That both said transfers were made and allowed without any authority in law on the part of said Samuel, and that they were void, and transferred no title to said shares as against the complainant; but that neither the Commercial and Farmers' Bank, nor the Merchants' Bank, would admit the invalidity of said transfers, nor the complainant's right to said shares, and to the dividends thereon.

The bill propounded certain interrogatories to the defendants, and prayed that it might be decreed that said transfers were null and void; that the shares transferred were still the property of the said Samuel Jones, Jr., as surviving trustee under the decree therein mentioned, and under the will of said Talbot Jones, deceased, and that it should be so entered upon the books of the Commercial and Farmers' Bank; and that there should be paid to the complainant the dividends declared on said shares in the month of November, 1845, and in the year 1846.

The answer of Daniel Sprigg, cashier of the Merchants' Bank, admitted that he had heard that Talbot Jones died in 1834, and left a will of which Samuel Jones, Jr., and Andrew D. Jones were executors, and that he was told by William J. Albert, at a meeting of the creditors of Talbot Jones & Co. in the autumn of 1846, that two hundred and eighty-two shares of stock of the Commercial and Farmers' Bank were left by said Jones as a part of his estate; and that he was subsequently, and after the 4th of December, 1846, informed by said Albert of the decree which he supposed was the decree mentioned in the bill; but that he had never heard previously to said conversations with said Albert, either of said trusts, or of said decree. That he was the cashier of the Merchants' Bank on the 4th of May and 17th of

August, 1842, and still was, but that he was not, at either of said periods, aware of the existence or of the contents of the decree referred to in said bill; that the first information he ever obtained of said decree, so far as he recollected, as already stated, was some time after the 4th of December, 1846, when he was informed by Mr. Wm. J. Albert of the existence of a decree, and of its contents, which decree he supposed was the one referred to in said bill. That Andrew D. Jones was a partner in the firm of Jones, Burneston & Co., and did business in Baltimore to the time of his death, in 1846; that Samuel Jones, Jr., was insolvent, and that respondent was the guardian of William B. Norman.

The answer of the Merchants' Bank stated that Daniel Sprigg was its cashier on the 4th of May and 17th of August, 1842, and still was; that the respondent had no knowledge or information whether or not, on or before either of said days, said Sprigg was or was not aware of the existence or contents of the decree referred to in the bill, except what it had derived from said Sprigg himself since the bill was filed; that it maintained that it was not to be, in any manner, concluded or affected by any knowledge or information which said Sprigg might have acquired in his private capacity, but nevertheless stated that said Sprigg had told respondent that he had no knowledge whatever of said decree, on or before either of said days, and that the first information he ever obtained of said decree was some time after the 4th of December, 1846, when he was informed by Mr. Wm. J. Albert, that a decree existed which the said Sprigg supposed to be the one referred to in the bill. That on the 4th of May, 1842, the respondent discounted for Talbot Jones & Co. two notes for $2500, which became due, respectively, on the 6th and 16th of June, 1842; to secure which loan, Messrs. Talbot Jones & Co. deposited with the respondent a certificate of two hundred and eighty-two shares of stock of the Commercial and Farmers' Bank, made out in the name of the respondent, and brought to it by Samuel Jones, Jr., one of said firm, as the security for said loan; and the respondent supposed that on the said 4th of May, the transfer to it was made on the books of the Commercial and Farmers' Bank, but had never examined said books, and had no agency whatever in making said transfer, and no knowledge of it except what was contained on the face of the certificate, and did not know in whose name the stock stood previously to the transfer, or by whom the transfer was made, or that it was claimed by or belonged to any person except the said Talbot Jones & Co. That it was the usual course, in lending upon the security of stock, for the borrower to deposit with the lender the certificate of the stock to be hypothecated, made out in the name of the lender, and previously transferred to him, and that it was entirely unusual,

in such cases, and in all cases of the transfer of stock, for the transferrees to examine into the transfers thereof, or to inquire in whose name the stock stood previously to the transfer, or by whom the transfers were made, but that a certificate of stock, regularly made out in the name of the transferree, as aforesaid, was considered as conveying a good title, behind which it was not the custom, nor was it considered necessary to look. That on the payment of said notes, the respondent, by the usual power of attorney, authorized the re-transfer of said shares of stock, and supposed that the same was transferred into the name of Talbot Jones & Co. That on the 16th of August, 1842, the respondent made a loan to Talbot Jones & Co. upon a hypothecation of two hundred and eighty-two shares of the stock of the Commercial and Farmers' Bank, transferred to it on the 17th of the same month; that the money so loaned was duly paid, but the respondent continued to retain the said shares of stock standing in its name, and from time to time, made loans to said firm of Talbot Jones & Co., upon the faith and security of said stock, until February, 1845, when a note of the said firm for $5000 was discounted by the respondent, on the security of said stock, and at the same time, an agreement was made between them (filed with the answer) by which the respondent, on default being made in the payment of said note, or any of its renewals, was authorized to sell the said stock, and apply the proceeds to its payment; that said note was subsequently renewed from time to time, and on the first of August, 1846, the note was given by way of renewal, which the respondent exhibited as part of its answer, which note fell due and was protested on the 4th of December, 1846; that the note so exhibited was likewise discounted by the respondent for said Talbot Jones & Co., and with their consent, and upon the security of said two hundred and eighty-two shares of stock, transferred as aforesaid on the 17th of August, 1842, and held by it at the time of said discount. That when said first notes were discounted, there were no endorsers to them, and no security of any kind was given therefor, except the said stock, until the 17th of September, 1844, when the note then given by Talbot Jones & Co. was endorsed by Jones, Burneston & Co., who continued to endorse the renewals, from that time, until the note above mentioned was given; but that the respondent looked mainly to said shares of stock as security for said loan and its renewals. That Andrew D. Jones was a member of the firm of Jones, Burneston & Co., and Samuel Jones, Jr., was sole member of the firm of Talbot Jones & Co. That the first notice which the respondent received of the claim set up by the complainant to said stock, was a letter dated the 3d of December, 1846, from William J. Albert, claiming to act as attorney for the complainant, to which the respondent replied by a letter dated about the 4th of December.

That the respondent had every reason to suppose that said stock belonged to Talbot Jones & Co., and no one else, until the autumn of 1846, when, at a meeting of the creditors of Talbot Jones & Co., said Albert made an undefined claim to said stock. That said Samuel Jones, Jr., for a great number of years, was largely engaged in business by the name of Talbot Jones & Co. That said firm until long after the year 1842, enjoyed a very high degree of credit, and said Samuel Jones, Jr., during said period, and until his failure, possessed the entire confidence of the community as a man of integrity and honor. That the note above mentioned, not having been paid at maturity, the respondent placed said stock for sale in the hands of Wm. Woodville, a broker in the city of Baltimore, and the same was sold, and the balance of the proceeds, after paying said debt, amounted to $470 52, which had been carried to the credit of the suspense account of the respondent, in ignorance of what other disposition to make of it; that whilst said stock was pledged to respondent, the dividends were drawn by or paid over to the firm of Talbot Jones & Co., except a balance of $157 92, which had been added to the said suspense account, making the amount of said account $628 44. And that the respondent was a creditor of the firm of Talbot Jones & Co. for other loans, to a much larger amount than the said sum of $628 44.

The answer of the president and directors of the Commercial and Farmers' Bank stated, that the said Talbot Jones, deceased, was, at the time of his death, as appeared by the books of the said bank, the owner of two hundred and eighty-two shares of the stock of said bank; that they did not know anything of the last will and testament of said Talbot, further than they had heard; and they believed that he left a will, and that his sons Samuel Jones, Jr., and Andrew D. Jones, the latter of whom had lately departed this life, were the executors thereof; but the respondents had no knowledge, at the time, that said Talbot bequeathed said shares of stock to the complainant, or for her use, nor did they then know of said fact, further than by hearsay, and by the statement thereof in the bill. That they had no knowledge of the passing of the decree by the chancery court of Maryland, as stated by the complainant, and never heard thereof till after the failure of Samuel Jones, Jr., in July or August, 1846; neither did they know of any apportionment of said stock, or any part thereof under said decree, further than the same was disclosed by the bill aforesaid; they admitted that said shares of stock continued to stand on the books of the Commercial and Farmers' Bank, in the name of said Talbot Jones, until the said 4th day of May, 1842, when a transfer of the same was made to the Merchants' Bank of Baltimore; and for the several transfers of said shares, at various times since, and by whom made, until the 11th day of December, 1846, inclusive, they referred to copies from the transfer book of said bank, and a list of the names of the persons to whom they were finally transferred by William Woodville. That they did not know that, at the time of the death of said Talbot Jones, the then president, and one or more of the directors of the Commercial and Farmers' Bank, knew the contents of the will of said Talbot, or that they knew of the existence of the decree aforesaid, but they thought it probable, from the connection existing between the then president, and the family of said Talbot, that at the time of the transfers to the Merchants' Bank of said stock, the contents of the will of the said Talbot were known to the then president of the Commercial and Farmers' Bank; but that said president was altogether ignorant of the making of said transfers, and did not in any manner or way sanction the same; that the transfers of said stock, made on the 4th of May and 17th of August, 1842, were not, at the time, known to the then president of the bank, or to the respondents; they denied that said transfers were made with the sanction of the respondents, or of their then president, who would certainly have objected to the making thereof, in the manner in which they were made, had they known, at the time, of the intention of Samuel Jones, Jr., so to make them. They admitted that Andrew D. Jones, deceased, was a resident of the city of Baltimore, and they also stated that the dividends mentioned in said bill, amounting to $592 20, were paid to the Merchants' Bank of Baltimore. They also admitted the insolvency of Samuel Jones, Jr.; that William B. Norman was an infant, and Daniel Sprigg was his guardian. That at the time of the transfer of said stock, on the 4th of May, 1842, there was in existence a by-law of their corporation on the subject of transfers by executors, and other legal representatives, a copy of which they filed, which was still unrepealed, and that until very lately, no evidence of the authority of executors or guardians to make transfers was required, other than a certificate of their appointment; that they believed and charged that the debt for which the said stock was hypothecated to the Merchants' Bank, on the 17th of August, 1842, was fully paid by Talbot Jones & Co., and that it became and was the duty of the Merchants' Bank immediately on the payment of said debt, to re-transfer said stock to the said executors of Talbot Jones, and had it been so transferred, it would have placed it in the power of the respondents to prevent any further transfer of said stock; but that, instead of doing so, said Merchants' Bank, without having any lien thereon, or any proper authority so to do, retained said stock as its own, and afterwards, from time to time, discounted the notes of said Talbot Jones & Co., for differ-

ent amounts, and at different times of payment; by which, as they alleged and charged, the Merchants' Bank made itself responsible for the value of said stock to the respondents, or to any one else having a just claim thereto, and more especially to those for whose use it was bequeathed in trust by said Talbot Jones, if there were any liability for the same to the said parties.

And the respondents, in answer to the interrogatories appended to the bill, said, to the first interrogatory, that they admitted the death of Talbot Jones in the year 1834, and that at the time of his death, he held two hundred and eighty-two shares of the stock of the respondent's bank, standing in his name on the books of said bank; and that the present officers of said bank did not know anything of the will of said Talbot Jones, further than by hearsay. To the second interrogatory, that at the time of the death of said Talbot Jones, it was not known to the officers of the bank, or to the bank, that said two hundred and eighty-two shares of stock were devised in trust, as stated in the bill, neither was it known that said officers or the bank knew of the decree of the high court of chancery, at the time of the passing thereof, or of the terms thereof, nor was it in any manner made known to the officers of the bank, till after the failure of Samuel Jones, Jr., in July or August, 1846. To the fourth interrogatory, that on the 4th of May and 17th of August in the year 1842, Jacob Albert was president of said bank, and Joseph (not Robert) Taylor was a director, and it was known that Talbot Jones died several years before, and was believed to have died rich; but they did not know anything of the debts for which his estate was liable, nor when, nor in what manner they were paid, nor whether they were paid; and that it was not known that Jacob Albert and Joseph Taylor were acquainted with the contents of said will. To the fifth interrogatory, that until the 4th of May, 1842, said two hundred and eighty-two shares of stock stood in the name of the said Talbot Jones, but the transfer thereof by Samuel Jones, Jr., on that day, and not the 17th of August following, was not made with the sanction or knowledge of Jacob Albert, the then president of the respondent's bank, who did not know thereof, until a considerable time after they had been a second time transferred to the Merchants' Bank; and they said, that had their then president known of the intention of said Samuel or Andrew Jones to make said transfers, he would have objected and not consented thereto. To the sixth interrogatory, that at the times of said transfers, there was in existence a by-law of their corporation on the subject inquired of, which was still in force, of which they annexed a copy, and they did not know whether any authority was filed or deposited at the time said transfers were made. To the eighth interrogatory, that Andrew D. Jones died in August or September,

1856, and at the time of his death, was a resident of Baltimore city, and in business there as a merchant; that Samuel Jones, Jr., was insolvent, and that Daniel Sprigg, they believed, was the guardian of William B. Norman, a minor.

The by-law referred to in the answer was in these words: "Sec. 10. The stock of the company shall be transferable on the books, only by the person in whose name it appears, or by his duly authorized attorney or representative. In all cases of transfer by attorney, the original letter of attorney, duly proved, shall be deposited and remain with the bank. And in case of transfer by executors, administrators or guardians, or other legal representatives, duly authenticated evidences of their authority shall be deposited and remain in the bank. No transfer shall be made, until the certificate granted to the transferrer shall be produced at the bank."

The answer of William J. Albert and Emily his wife, and Josiah Jones, Jr., admitted the statements of the bill so far as they were within their knowledge, and denied the validity of said transfers as against their residuary interests therein.

The answer of Samuel Jones, Jr., admitted the death of Talbot Jones in March, 1834, the bequest of said stock, the passage of the decree in chancery, the transfers of said stock, the death of Andrew D. Jones, who at the time of his death was a resident of, and doing business in, Baltimore, his own insolvency, the infancy of William B. Norman, and the appointment of Daniel Sprigg as his guardian.

A good deal of testimony was taken, the effect of which is sufficiently stated in the opinion of the court.

J. Mason Campbell, for complainant.
Brown & Brune, for Merchants' Bank.
R. Johnson and Sam'l J. Donaldson, for Commercial and Farmers' Bank.

TANEY, Circuit Justice. In order to understand the points which arise in this case, it is necessary to state the facts somewhat in detail. Talbot Jones, of the city of Baltimore, died in the year 1834, having first duly made his last will and testament, and appointed his sons, Samuel Jones and Andrew D. Jones, his executors, to whom letters testamentary were granted in the same year. The testator died possessed of a large amount of property of different kinds, and owned, at the time of his death, two hundred and eighty-two shares of stock in the Commercial and Farmers' Bank of Baltimore, standing in his name on the books of the bank. The dividends upon this stock is the matter of dispute.

The testator, by his will, bequeathed it, in trust for the complainant, during her life, in the following words: "I order and direct that my executors hereinafter named, or the survivor or acting one of them, shall receive

the dividends, from time to time declared and made payable on my stock in the Commercial and Farmers' Bank of Baltimore, in trust, that the said dividends shall be paid over or remitted by my executors, or the survivor or acting one of them, to my sister, Maria Lowry, now or lately of Dublin, in Ireland, during her natural life, and after her decease, to her daughter Mary Lowry, should she survive her mother, during the lifetime of the said Mary."

And in the succeeding clause of the will, this stock, together with other property, and also the general residue of his estate, is bequeathed to Samuel Jones and Andrew D. Jones and the survivor of them, and the "heirs, executors and administrators of such survivor, in trust for sundry persons named in the will, in certain proportions therein mentioned," subject to the devise of the dividends (on the stock) to his sister and daughter as aforesaid.

In 1839, upon a bill filed in the chancery court of the state by some of the parties interested, for the partition of the property bequeathed in the last-mentioned clause of the will, a decree was passed directing, among other things, that Samuel Jones and Andrew D. Jones should hold these two hundred and eighty-two shares of stock, in trust to pay the dividends to Maria Lowry, during her life, and after her death to be divided as mentioned in the decree: Mary Lowry, the daughter, died before the devise was made.

In this proceeding, Maria Lowry, the complainant, was made a defendant, and the bill taken pro confesso against her, upon publication in the usual form; but process was never served upon her; nor did she appear or answer; nor had she any interest whatever in the suit. By the decree, William B. Norman, Josiah Jones, and Emily J. Albert, are entitled to this stock upon the death of Mrs. Lowry; and on that account, it has been supposed to be advisable to make them parties in the case before the court.

After the death of Talbot Jones, Samuel Jones carried on business, on his individual account, in the name of Talbot Jones & Co.; and the transactions in the name of Talbot Jones & Co., mentioned in these proceedings, are the transactions of Samuel Jones, on his own individual account.

The stock in question continued to stand on books of the Commercial and Farmers' Bank in the name of Talbot Jones, until 4th May, 1842, when it was transferred to the Merchants' Bank by Samuel Jones; the other executor not joining in the transfer. This transfer, it appears, was made as security for a loan obtained by Samuel Jones from the Merchants' Bank, on his own private account, under his mercantile style and name of Talbot Jones & Co., and the money being afterwards paid, the stock was transferred to him by the bank, under the same name and style, on the 17th June in the same year; and

on the 20th of the same month, transferred by him as Talbot Jones & Co. to himself and Andrew D. Jones, as executors of Talbot Jones. On the 20th of August following, Samuel Jones, signing his name as acting executor, again transferred this stock to the Merchants' Bank, which continued to hold it as a pledge for sundry loans of money made, from time to time, to Talbot Jones & Co., until the 11th of December, 1846, when it was transferred to a broker, and sold to pay a note which fell due on the 4th of that month, and had been protested for non-payment.

Talbot Jones & Co., that is to say, Samuel Jones, stopped payment in September, 1846, and in January, 1847, petitioned for the benefit of the insolvent laws of this state; it is admitted on all hands, that he is utterly insolvent, and unable to pay any part of the dividends due to the complainant. After the last transfer to the Merchants' Bank, the dividends were either paid to its orders in favor of Talbot Jones & Co., or were drawn by the bank and paid over to him, with the exception of the last dividend, which fell due before the stock was sold. This is yet in the hands of the bank, except the sum of thirty-nine dollars and forty-eight cents which has been paid out of it for taxes on the stock. Notwithstanding the transfer of the stock in 1842, the amount of the dividends were regularly paid over to the complainant by the executors, until November, 1845; but the dividend declared at that time has not been paid to her, nor any of those subsequently. She had no notice of the transfer of the stock until October, 1846, after the last of the loans above mentioned had been made by the Merchants' Bank; and on the 3d of December following (the day before the note became due), she gave the bank notice of her claim.

When the stock was first transferred by Samuel Jones to the Merchants' Bank, a certificate was issued by the Commercial and Farmers' Bank, in the following words:

"Commercial and Farmers' Bank of
Baltimore.

"No. 707.                    May 4, 1842.

"This is to certify that the Merchants' Bank of Baltimore is entitled to two hundred and eighty-two shares in the capital stock of the Commercial and Farmers' Bank of Baltimore, on each of which thirty dollars have been paid, but which have since been reduced by the act of assembly to twenty dollars a share. Transferable at the bank only, personally or by attorney.

"Trueman Cross, Cashier.

"282 shares."

This certificate was delivered by Samuel Jones to the Merchants' Bank, when he obtained the first loan, and was re-delivered to him when the money was paid and the stock transferred to Talbot Jones & Co.; a similar certificate was again issued by the Commercial and Farmers' Bank, when the second

transfer was made to the Merchants' Bank, and was retained by it, until the stock was transferred to the broker to be sold, as hereinbefore mentioned.

This is a summary statement of the facts, so far as they are material to the decision of the case. It is very clear, that the money due to the complainant has been grossly misapplied; and the question is, whether she is entitled to relief against the banks, or either of them. Samuel Jones is undoubtedly liable; but as he is admitted to be insolvent, she can obtain no redress from him.

As concerns the Merchants' Bank, we see no ground upon which it can be liable beyond the amount of dividends remaining in its hands. It does not appear that the bank, when it accepted the pledge of this stock, or when it made its loans, had any reason to suppose that the stock had ever been held by Talbot Jones, or that it was transferred to the bank by Samuel Jones, as one of his executors. In order to obtain the loan upon the pledge of this stock, Samuel Jones did nothing more than produce the certificate of the Commercial and Farmers' Bank, showing that the two hundred and eighty-two shares of stock had been transferred to the Merchants' Bank; but the certificate did not shown by whom it had been transferred, nor to whom it had previously belonged; and according to the usual course of business, the presumption was that it belonged to Samuel Jones himself. The Merchants' Bank appears to have acted under this impression; for when the first loan was paid, and the lien of the bank thereby released, it transferred the stock to him individually, by the name of Talbot Jones & Co., and not to the executors of Talbot Jones.

It is very true, that the instrument of transfer upon the books of the Commercial and Farmers' Bank showed it to have been made by Samuel Jones, in his character of executor; and in general, a party must be presumed to have notice of everything that appears upon the face of the instrument under which he claims title. But a transfer of stock cannot, in this respect, be likened to an ordinary conveyance of real or personal property. The instrument transferring the title is not delivered to the party; the law requires it to be written on the books of the bank in which the stock is held; the party to whom it is transferred rarely, if ever, sees the entry, and relies altogether upon the certificate of the proper officer of the bank, stating that he is entitled to so many shares, that is to say, so many shares have been transferred to him by one who had a lawful right to make the transfer.

The case of Davis v. Bank of England, 2 Bing. 393, is a strong one on this head. The three per cent. consolidated annuities created by the English government, were made payable at the Bank of England, and transferable at the bank, in the manner pointed out by law; a large amount of these annuities, which belonged to the plaintiff in that case, and stood in his name, were transferred under a forged power of attorney; the property did not pass by this transfer. Yet the court held, that subsequent bona fide purchasers from the fraudulent transferree, whose name had been registered in the books of the bank as the owner, were entitled to recover from the bank the amount of dividends falling due on these annuities, although the bank was also liable to the true owner of the stock, whose name had been forged.

In this case, indeed, the executor had a legal capacity to make the transfer, and the legal title to the stock passed to the Merchants' Bank; and as it paid a valuable consideration, and had no notice, actual or constructive, of any violation of trust, upon which the transfer could be impeached in equity, it had a right to sell the stock for the payment of the note for which it was pledged, and to make the purchasers a valid title. A different rule would render the right of every purchaser of stock in a bank insecure or liable to doubt, and greatly impair its value, and would, moreover, seriously disturb the usages of trade and the established order of business in relation to this subject, in a manner highly injurious to the community; for purchasers always rely on the certificate of the bank in which it is held, as conclusive evidence of the ownership. Most commonly, the purchase is made through a broker, and the buyer does not know who is the seller or who makes the transfer; the certificate of the bank tells him that he is entitled to so many shares, and he pays his money upon receiving the certificate, without further inquiry. It would be unjust and inequitable, to charge the stock in his hands with any equitable incumbrance or trust, however created, which was not known to him at the time he paid his money.

As respects the Commercial and Farmers' Bank, the claim of the complainant rests upon different grounds. By the charter of the bank (like that of every other bank incorporated by a law of this state) the stock is transferable at the bank only, and according to such rules as shall be established by the president and directors. It cannot, therefore, be transferred without the supervision of the officer designated for that purpose by the bank. The corporation is thus made the custodian of the shares of stock, and clothed with power sufficient to protect the rights of every one interested, from unauthorized transfers; it is a trust placed in the hands of the corporation for the protection of individual interests, and like every other trustee, it is bound to execute the trust with proper diligence and care, and is responsible for any injury sustained by its negligence or misconduct. Upon this principle, the bank was held liable for an improper transfer of its stock, in the case of Farmers' & Mechanics' Bank v. Wayman, decided in the court

of appeals of this state, at December term, 1847 [5 Gill, 336]; and the case of Davis v. Bank of England, hereinbefore referred to, where government stocks were made transferable on the books of the bank, was decided upon the same ground. As the corporation appoints the officers before whom the transfers must be made, it is responsible for their acts, and must answer for their negligence or defaults, whenever the rights of a third person are concerned. Hodges v. Planters' Bank of Prince George's Co., 7 Gill & J. 306, 310.

Undoubtedly, the mere act of permitting this stock to be transferred by one of the executors, furnishes no ground for complaint against the bank, although it turns out that this executor was, by the act of transfer, converting the property to his own use; for an executor may sell or raise money on the property of the deceased, in the regular execution of his duty; and the party dealing with him is not bound to inquire into his object, nor liable for his misapplication of the money. Such is the doctrine of the English courts, and would seem to have been the law of this state, prior to the act of assembly of December session, 1843 (chapter 304); and the transaction now before us took place before that act went into operation. But it is equally clear, that if a party dealing with an executor, has, at the time, reasonable ground for believing that he intends to misapply the money, or is, in the very transaction, applying it to his own private use, the party so dealing is responsible to the persons injured. The cases upon this subject are numerous, and it would be tedious to refer to them particularly; they are for the most part collected and commented on in the cases of McLeod v. Drummond, 17 Ves. 152, and of Field v. Schieffelin, 7 Johns. Ch. 150.

It is very true, that in the case before us, the pledge of stock was not made to the Commercial and Farmers' Bank, nor did it loan the money to the executor. But a party is not made liable because he pays or advances money for property of the deceased; but because, by doing so, when he has reasonable ground for believing that the executor means to misapply it, he knowingly assists him in committing a breach of his trust. In this case, the rights of stockholders, and of persons interested in its stock, were placed by law under the guardianship and protection of the bank, so far as concerned the transfers on their books; the stock could not be transferred, could not become the legal property of another person, without the permission of the proper officers of the corporation. Union Bank v. Laird, 2 Wheat. [15 U. S.] 393. And if these officers, at the time of the transfer, had reason to believe that the executor, by the act of transfer, was converting this stock to his own use. in violation of his duty, then the bank, by permitting the transfer knowingly, enabled the executor to commit a breach of his trust, and upon principles of justice and equity, is as fully liable as if it had shared in the profits of the transaction. The object of the executor could not have been accomplished without the co-operation of the bank in permitting the transfer to be made on its books.

The question then is, had the bank at the time of the transfer. actual or constructive notice that the executor was abusing his trust. and applying this stock to his own use? The bank, by its answer, denies that it knew anything of the contents of Talbot Jones's will, or of the bequest to the complainant; and there is no proof of actual notice; but it did know that this stock was the property of Talbot Jones at the time of his death, for it so stood upon its own books; and as the transfer was made by Samuel Jones, as his executor, the bank must, of course, have known that Talbot Jones left a will. Although it may not have had actual notice of the contents of the will, yet as it was dealing with an executor in his character as such, the law implies notice; this is the doctrine in the English court of chancery. 4 Madd. 190. And the rule appears to stand upon still firmer ground in this state; for now it is settled, that every person has constructive notice of a deed for real or personal property, where it is duly registered according to law; in England, the weight of authority is perhaps to the contrary. Now, in Maryland, every will of real or personal property is required to be recorded; and if third persons are bound, at their peril, to take notice of a registered deed, when there is nothing to lead them to inquiry, the obligation must be still stronger upon one who is dealing with an executor concerning the assets of the deceased; for his character of executor, of itself, gives actual notice that there is a will open to inspection upon the public records.

The bank, therefore, was bound to take notice of the will when this transfer was proposed to be made by one of the executors; and is chargeable to the same extent as if it had actually read it. It was negligence in the bank not to examine it; and if it was ignorant of the contents of the will and of the specific bequest of this stock, it was its own fault. It must be dealt with in this case, as if it had possessed actual knowledge that the stock in question was specifically bequeathed by the testator, and was not by the will to be transferred. or in any manner disposed of, by the executors, during the lifetime of the complainant: and that it was the duty of the bank, during that time, to pay the dividends to them in trust for the complainant.

Undoubtedly, this stock, although thus specifically bequeathed, was yet liable to be sold, if necessary, for the payment of the debts of the testator; and if the bank did not know, or had no reasonable ground for

supposing, that the executor was misapplying the assets, it would not be responsible, notwithstanding its implied knowledge of the will. But when the second transfer (under which the stock was finally sold) was made to the Merchants' Bank, the circumstances then within the knowledge of the Commercial and Farmers' Bank, were abundantly sufficient to satisfy any reasonable mind, that Samuel Jones was using this stock for his private purposes. This transfer took place on the 20th of August, 1842; the bank at that time knew that Talbot Jones had been dead eight years; that he died rich; and that the time had long before elapsed within which the law of Maryland requires an estate to be settled up by an executor or administrator. It appeared by their own transfer books that, on the 4th of May preceding, the same stock had been transferred by Samuel Jones to the same bank (the other executor, although he resided in town, not being a party to the transfer); that on the 17th of June, in the same year, it was re-transferred by the Merchants' Bank to Samuel Jones in his individual right, under the name of Talbot Jones & Co., and by him restored to the estate of the testator, a few days afterwards, by a transfer to himself and the other executor. And when, after these transactions, all appearing on the books of the bank, he came again, without his co-executor, to transfer it a second time to the Merchants' Bank, could the officers of the Commercial and Farmers' Bank doubt the purposes for which this second transfer was made? Familiar as they must have been with the usual course of business in the banks, and the usage of loaning money upon hypothecation of stock, could they have failed to see that Samuel Jones was misapplying the assets of the testator, and pledging this stock for his own individual benefit?

Indeed, the bank, in its answer, does not deny it, but on the contrary, impliedly admits it; for the answer states that, if the president had known that the transfer was about to be made by Samuel Jones, he would have prevented it. Now, the bank is equally chargeable for the neglect or omission of duty by the officer to whom it had committed the superintendence of the transfers of stock, as it is for the neglect or omissions of its president; and such officer was also equally chargeable with implied notice of the will of Talbot Jones, and equally bound to refuse the transfer when he saw that Samuel Jones was using this stock in violation of his trust as executor. And if the circumstances above mentioned were not sufficient to satisfy the bank officer, beyond all reasonable doubt, that he was so using them, yet they were certainly sufficient to create strong presumptions against him, and to make it the duty of the officer to inquire before he allowed the transfer to be made. If he neglected to make the inquiry, when the fact could have

been so easily ascertained, and either from negligence or design, without inquiry, enabled the executor to convert the stock to his own use, the bank is responsible for this negligence.

There is another circumstance also, which ought, of itself, to have created strong doubts in the mind of the transfer officer of the bank. By the act of assembly of Maryland of 1798 (section 3) it is in the power of the executor to procure an order of sale from the orphans' court, whenever a sale shall be necessary. It is true, that in the case of Allender v. Riston, 2 Gill & J. 86, the opinion of the court would seem to have been that, notwithstanding this act of assembly, an assignment by an executor, for his own debt, would be valid against the creditors of the estate, unless there was collusion with the executor. But the case was not decided on that point; nor does the opinion of the court apply to an assignment of property specifically bequeathed; nor was that point in the case, or raised in the argument. However that question shall be ultimately decided, it may, we think, be safely asserted that, in practice, under this law, there has been no instance in Maryland, since its passage, in which an executor, acting fairly and bona fide, has undertaken to sell or pledge personal property, specifically bequeathed, without a previous order from the orphans' court. And the proposition of Samuel Jones, one of two executors (the other executor not uniting in the transfer), to transfer this stock, so long after the death of a wealthy testator, without first obtaining an order from the court to justify him, must have satisfied any man of common experience in business that he was grossly abusing his trust. In South Carolina, under a law very similar in its provisions, it has been decided that the sale of such property by an executor is void, unless made by the authority of the court. 4 Desaus. Eq. 522. And we think there are strong reasons to support this decision.

The cases referred to in relation to transfers of government stocks by the Bank of England do not apply to this case. They are collected in 1 Daniell, Ch. Prac. 139, and they all turn upon the meaning and policy of the acts of parliament by which the management of the public stocks and annuities was given to the Bank of England. It is with reference to the duties imposed by these acts of parliament, that the court say, that the Bank of England is not bound to take notice of a trust affecting public stock standing on its books, and must look only to the legal estate. But this opinion cannot influence the decision of this case; because the privileges and obligations of the bank must be determined by its own charter, differing widely in its terms and its object from the English acts of parliament. Certainly, none of the English acts convey the idea that, upon general principles of law, a bank is not bound to notice a trust of its own

stock, and must look only to the legal estate; for a bank or any other corporation is bound by the same obligations, moral and legal (when the rights of third parties are concerned), that apply to the case of an individual, unless it is explicitly exempted by law. If an individual who confederates with an executor, and assists him in defrauding his cestui que trust, is liable to the party injured, there can be no reason why a bank which knowingly enables an executor to convert the property of the cestui que trust to his own private use, should not be equally responsible. The difficulties to which the Bank of England would be subjected, if bound to take notice of the trusts in the government stocks, and which are strongly stated by the chancellor in the case of Hartga v. Bank of England, 3 Ves. 58, are altogether inapplicable here; for, putting aside the immense difference in amount and character between the government stocks of England and the stock of this bank, a chancery suit can never be necessary in this state for the protection of the bank, where stock bequeathed in trust is required to be sold for the payment of debts; because, under the act of 1798, an order for the sale, by the orphans' court, which could at any time be obtained in a summary way, without delay and without expense, would protect the bank from all responsibility, and occasion no delay or embarrassment in the payment of debts.

The case then is this: The will of the testator, in effect, directed that this stock should not be sold or transferred during the lifetime of the complainant, and the dividends, during that time, should be received by his executors and paid over to the complainant. One of these executors proposes to transfer this stock, in order to raise money on it for his private purposes; and the officers of the bank, knowing the purpose for which it was transferred, or with circumstances before them sufficient to create a strong presumption that such was the intention of the executor, and therefore, sufficient to put them on inquiry, permit the transfer and certify that the transferree is entitled to the stock. Relying on this certificate, the Merchants' Bank was induced to loan its money upon it, and having no knowledge that it ever belonged to Talbot Jones, or had been transferred by his executor, the stock cannot be followed in its hands, or the hands of those to whom it afterwards sold it, and charged with the trust created by the will. The executor is insolvent, and there is, therefore, no effectual remedy against him. Ought the loss to be borne by the complainant, who has committed no fault and been guilty of no negligence, or by the Commercial and Farmers' Bank?

The established principles of equity seem to require that the loss should be borne by the party by whose negligence or misconduct it was occasioned. The bank not only enabled the executor to perpetrate the wrong by permitting the transfer, but co-operated in it, by certifying that the title of transferree was good; justice, therefore, requires that it should bear the loss.

The only remaining question is, the nature of the relief to be administered by the court. In order to do substantial justice, it is evident, that the decree must be directly against the bank, as Samuel Jones is admitted to be utterly insolvent.

The complainant's claim is for dividends only; she has no property in the stock, which belongs to the defendants. William B. Norman, Josiah Jones and Emily J. Albert, in certain proportions, who will be entitled to the dividends after the death of the complainant. Yet, if there were no difficulty on the score of jurisdiction, the court would, according to the practice of courts of chancery, proceed to dispose of the whole matter in dispute, and decree as to the stock, and the balance in hand in the Merchants' Bank, as well as the dividends. But the jurisdiction of this court is founded upon the fact that the complainant is an alien; it has no jurisdiction in the controversies between the defendants, as they all reside in Maryland. Undoubtedly, if the case of the complainant could not be disposed of, and relief administered to her, without deciding upon the rights of all the parties before the court, we should necessarily dispose of the whole matter, and decree as to the stock, as well as the dividends. But the rights of the complainant may be adjusted, without interfering with the right of the claimants of the stock, or with the balance arising from its sale, which yet remains in the hands of the Merchants' Bank; for it is immaterial to the complainant, whether the stock be replaced or not. All that she has a right to demand is, that the amount of dividends on two hundred and eighty-two shares of stock, which she has lost by the negligence or the misconduct of the officers of the bank, shall be paid to her, as if the stock had never been transferred. The jurisdiction, therefore, to decree in the controversy as to the stock, cannot, we think, be maintained.

We have said nothing of the decree of the chancery court of Maryland, which has been filed in the case; neither of the banks were parties to the proceedings in that case, nor do they appear to have had notice of it; neither was the complainant a necessary party; she had no interest in the property to be divided; it was not proposed to change or modify, in any respect, the trust in her favor; and the decree passed by the court leaves her interests precisely where they stood before.

In regard to the stock itself, the decree for partition has, in a material respect, changed the character of the trust; for the two executors, instead of holding it, in undivided portions, for the cestuis que trust named in the will, hold under the decree, as trustees for those to whom it has been specially as-

signed in severalty. And it may be doubted, whether this circumstance does not form an additional objection to the jurisdiction of this court in regard to the stock; and whether Samuel Jones and Andrew D. Jones ought not to be considered as trustees, appointed in that respect by the court of chancery, to hold this stock in trust for cestuis que trust named in the decree, and therefore, responsible for their conduct to that court, rather than to a court of the United States. It is, however, not necessary to examine this question, because it does not affect the dividends bequeathed to the complainant, and certainly, can form no objection to the jurisdiction in her case.

It appears from the evidence, that the stock sold for more than enough to pay the note for which it was hypothecated; and that, besides the surplus arising from this sale, one of the semi-annual dividends upon these two hundred and eighty-two shares remains in the hands of the Merchants' Bank, deducting therefrom the amount paid by the bank for taxes on this stock; the amount of the dividend remaining in the hands of the Merchants' Bank, subject to the deduction aforesaid, belongs in equity to the complainant, and for that amount she is entitled to a decree against the Merchants' Bank. For the residue of the dividends due to her, and remaining unpaid, the Commercial and Farmers' Bank must answer.

The case must be referred to a master, to state an account according to this opinion, preparatory to a final decree.