Foster *v.* Dey.

---

FOSTER, appellant, and DEY and others, respondents.

Where a purchaser from a trustee is not bound to see to the application of the purchase money, his title to a mortgage can be defeated only by evidence showing that at the time of the assignment he knew that the trustee contemplated a breach of trust, and intended to misappropriate the money, or was, by the very act, applying it to his own private purpose.

On appeal from a decree of the Chancellor. The case is reported in 11 *C. E. Green* 182.

*Mr. Joel Parker* and *Mr. Isaac W. Scudder,* for appellant.

*Mr. Charles Borcherling* and *Mr. James Richards,* (of New York,) for respondents.

The opinion of the court was delivered by REED, J.

James R. Dey and James C. Dey were trustees under a deed made by Richard Dey, dated October 1st, 1845. A mortgage for $7000, made by William H. and Edward W. McClave, was assigned to one Gilbert, and by Gilbert to these trustees. James C. died December 13th, 1865, leaving James R. the sole surviving trustee. As such, he assigned this McClave mortgage in January, 1868, to the appellant, James T. Foster. A bill was filed to compel an account from James R. Dey, the trustee, and also to compel Foster to deliver up the said mortgage for the benefit of the

trust estate, and to account for the interest received by him thereon. A decree was made in accordance with the prayer of the complainant.

Foster appeals from the decree against himself. The decree against Foster was made upon the ground that the assignment of this mortgage to him by Dey was fraudulent, and that he was a party to the fraud.

The authority of the trustee, under the deed of trust, was general and comprehensive. He could sell or lease lands; he could pay off encumbrances; he could make improvements; he could invest moneys on bond and mortgage, and could pay legacies, &c. That James R. Dey had authority to sell this mortgage is clear; indeed, it is admitted in complainant's bill. It is clear that he misapplied the moneys received from the sale. He placed the money into two houses, erected on his own land. This was a disposition of the money entirely foreign to the object of the trust. It was a palpable misappropriation of the funds. But that fact does not in itself invalidate Foster's title. The law did not in this case impose upon him the obligation to see to the application of the purchase money. _Perry on Trusts_, § 795. Foster's title can only be defeated by evidence showing that, at the time of the assignment, he knew that the trustee contemplated a breach of trust, and intended to misapply the money, or was, by the very transaction, applying it to his own private purposes. _Field_ v. _Schieffelin_, 7 _Johns. Ch._ 150.

The bill is framed upon the idea that the trustee was, by the very transaction, applying the mortgage to his private purpose. The allegation is that Dey, the trustee, was personally indebted to Foster in the sum of $15,000, and that for the payment of that sum, the trustee assigned, with other securities, this mortgage. There is nowhere in the bill an allegation that money was received at the time, and in consideration of the assignment, that such money was misapplied, and that Foster had fraudulent knowledge of the intended misappropriation. The only issue raised is, did the trustee assign the mortgage for the payment of an antecedent personal debt owing

by him to Foster? That the assignment was not made for such purpose is clear. The three checks for the sums of $3081.30, $300, and $2700, respectively, with the testimony of Foster as to the calculation of discount, and method of payment, together with the testimony of Dey, places this question beyond controversy. Indeed, it was not made a question in the argument, nor is it an element in the Chancellor's opinion. Upon the issue raised in the pleadings, therefore, the title of Foster is valid.

The bulk of the evidence taken, the argument, the opinion of the Chancellor, are concerned in establishing or discussing questions of fact entirely beyond the scope of matters pleaded. As a matter of principle, this evidence could be rejected as irrelevant.

The good sense of pleading and the language of the books both require that every material allegation should be put in issue by the pleadings, so that the parties may be duly apprised of the essential inquiry, and may be enabled to collect testimony and form interrogatories in order to meet the question. Without the observance of this rule, the use of pleadings becomes lost, and parties may be taken at the hearing by surprise. *Moores* v. *Moores,* 1 *C. E. Green* 278 ; *Burnham* v. *Dalling,* 3 *C. E. Green* 134, and cases cited.

How the aspect of the cause would have shifted had the issue decided been raised, can only be conjectured, and it is unfair to conclude parties by adjudicating upon an issue first made by the evidence, and not technically within the limits of inquiry. As, however, no objection was made to the testimony as irrelevant in this particular, and as I am forced to the conclusion that the complainant below stands in no better position upon the case made by the evidence, I will consider the cause as here presented.

The facts which below induced the Chancellor to a conclusion that Foster had a fraudulent knowledge of the intended misappropriation of the funds received from this assignment, were these : *First.* That, according to the statements of Dey and Foster, the latter was indebted to the former in the sum

of $51,045, on advances secured by fertilizers, and $4500 secured by mortgage; that Foster does not produce his books to show his dealings, and does not recollect what other mortgages, if any, he held upon Dey's property at the time of this assignment. *Second.* That Dey's clerk collected the interest and receipted for it in the name of Dey, after the assignment. *Third.* That Foster did not inquire concerning the use by the trustee of the money received, nor about the value of the mortgaged premises; and *Fourth.* That Dey sold the mortgage at a discount of fourteen per cent. The answers of both Dey and Foster, and their testimony, are to the effect that, during the period of these transactions, both occupied the same office, and that Dey was a manufacturer, and Foster a dealer, in fertilizers; that Dey advanced fertilizers, and Foster advanced money, and upon their sale deducted his commissions. At the time of this assignment the advance of money to Dey, and, of course, of fertilizers to Foster, amounted to $48,861. Dey says that at that time he was solvent; that subsequently his poudrette works were indicted. He was compelled to tear down his kilns, erected at great expense, and his business, the source of revenue, was suspended. This, with a failure of a creditor, resulted in bankruptcy in the fall. While his business was heavy, and he was a large borrower, the evidence does not convince me that he supposed himself insolvent at the beginning of the year 1868. It certainly does not show that Foster had any knowledge of his insolvency. Every cent Foster had advanced to Dey was secured by property owned by Dey, either personal or real. There is nothing to show that he had knowledge of any other indebtedness of Dey which he was unable to pay or secure. Nor would the fact that the trustee was borrowing large sums of money, and that his property was mortgaged, be sufficient, in my opinion, to advertise the purchaser of a trust security, of an intention on the part of the trustee to misapply the proceeds of the assignment.

Again, the interest was collected subsequently to the assignment, by checks drawn in the name of Mr. Dey, as they had been drawn previously. Mr. Woodruff was a clerk

of Mr. Dey; he was known as his clerk; he was accustomed to collect and receipt for him; he was in the office occupied by Foster. After the assignment, Foster requested him to receive this money. He did so, and paid it to Foster. He took checks and receipted, as the McClaves evidently knew he was authorized to do, in the name of Dey. I think it was done to avoid the trouble of a notice of the assignment and the execution of a new power from Foster to collect and receipt. This circumstance does not impress me as very significant upon the fact of Foster's knowledge of Dey's intention to defraud the estate by his misappropriation of trust funds, while insolvent. On the other hand, it strikes me that if a man as cautious as Foster, had been privy to such a design on the part of Dey, he would not have imperiled his title to this mortgage by so open and provable a transaction, if it could, in any degree, be construed into evidence of his participation in the fraud.

Again, that Foster did not inquire into the value of the mortgaged premises, cannot affect the present question. He certainly paid the amount of the mortgage, less the discount. The effect of any doubt about the security would be to account for a low or inadequate consideration paid for the mortgage. Beyond that it has no force.

Lastly, the rate of discount is relied upon to show, not a doubt of the freehold security, but that the discount was so great that it should have warned Foster that Dey was necessitous, and that he had pressing need for money at the time of the assignment; that the fact of such necessity should have raised in Foster's mind a conviction that the purpose of the sale was illegitimate and fraudulent. If the consideration received for this mortgage was strikingly below the market value of such securities, it would certainly be a strong circumstance to warn a purchaser of the improbability of a trustee making such a ruinous sacrifice for the purposes of the trust estate. But was the rate of discount in this instance excessive? The mortgage was a six per cent. security. It did not mature until 1870 and '71, one-half in October of each year.

The legal rate was seven per cent. The mortgage at par was worth only $6985. Foster paid $6081. The discount was a trifle less than thirteen per cent. This was at the beginning of the year 1868. I think no person conversant with the sale of mortgages at that time, particularly in the section of the state where this was negotiated, can say that it was an unusual transaction. If not unusual in itself, then it cannot become so by the fact that the sale was made by a trustee. Under this trust deed, the need of money for the purposes of the trust estate might easily, before the maturity of that mortgage, become imperative. The trustee so having the power of sale, and it having been made in what I conceive to be no unusual manner, or at no obvious sacrifice, I do not think any knowledge can, from it, be charged upon Foster of the intended disposition by Dey of the trust fund received from the sale.

My conclusion upon the whole case is, that the evidence is insufficient to show that " at the time of the assignment he knew that the trustee contemplated a breach of trust, and intended to misapply the money."

The decree made against the said Foster should be reversed.

For reversal—BEASLEY, C. J., CLEMENT, DEPUE, DIXON, DODD, GREEN, LATHROP, REED, SCUDDER, WALES. 10.

For affirmance—DALRIMPLE, KNAPP, VAN SYCKEL, WOODHULL. 4.