HEARD NOVEMBER TERM, 1878.

CASE No. 720.

ARCHIBALD Q. McDUFFIE v. ROBERT C. McINTYRE ET AL.

1. A guardian has no power to sell a bond and mortgage belonging to the estate of his ward. *Cases reviewed.*
2. The court will not confirm a sale of a ward's property made by his guardian without authority, which has not proved advantageous to the ward, and where it appears that the purchaser paid in part with a debt due to him by the guardian individually, and there is no evidence to disprove the suspicion reasonably suggested by the attendant circumstances that the whole amount was to be used by the guardian, then largely in debt, for his own purposes.

Before TOWNSEND, J., at Marion, July, 1875.

This was an action by A. Q. McDuffie, as assignee of R. H. Reaves, against R. C. McIntyre, Knight Gibson and his wife, Eliza E., (formerly Eliza E. Black) and H. McClenaghan, administrator of C. H. Black, deceased.

The case is fully stated in the Circuit decree, which is as follows :

This is an action for the foreclosure or a mortgage. The plaintiff in his complaint alleges the execution of the bond and mortgage, certain payments made thereon, the assignment of the bond and mortgage to him, and the breach of the condition of the bond, and prays for a sale of the mortgaged premises. The plaintiff further alleges that he is informed that certain parties claim that the assignment to him of the bond and mortgage was wrongful and should not be sustained, and that they are entitled to the property or the proceeds of the sale. He asserts that the claim is unfounded, and has brought the parties before the court, and asks for an adjudication of their rights.

The defendant, R. C. McIntyre, has made no answer to the complaint.

The answer of Knight Gibson and Eliza E., his wife, by N. S. Gibson, guardian *ad litem*, admits the execution of the bond and mortgage, the assignment of the same to R. H. Reaves as guar-

dian, and the death of Charles C. Black, leaving as his heirs-at-law, C. Henry Black and Eliza E., wife of Knight Gibson, and the death of C. Henry Black, and the granting of letters of administration upon his estate to Horatio McClenaghan.

The defendants further say that they have no knowledge respecting the amounts paid on the bond, or whether the assignment to the plaintiff was for full value, and submit, if such arrangement was made, R. H. Reaves, as lawful guardian, had no lawful authority to do so, and deny that the plaintiff is the lawful owner and holder thereof.

They further allege that at and before the date of the alleged assignment, it was known to the plaintiff that R. H. Reaves held the said bond and mortgage as the property of Eliza E. Gibson, and he received the same with full notice of the trust attaching thereto.

They further insist that the property and title of Eliza Gibson and Charles Black in and to the said bond and mortgage was not divested, or any way affected by such transfer and assignment. The defendants do not object to a foreclosure of the mortgage and a sale of the land, but insist that they are entitled to the proceeds.

The answer of Horatio McClenaghan is substantially the same as that of Knight Gibson and his wife, Eliza E.

At the hearing of the cause, a judgment of foreclosure and sale was rendered. The question who will be entitled to the proceeds of sale, was submitted for the decision of the court, and this is the only one remaining for consideration.

Testimony was offered, and argument of counsel heard on the question.

For a proper understanding of the case, the facts as admitted and proved should be stated.

In December, 1856, the bond and mortgage in question were executed by R. C. McIntyre to secure the payment of the purchase money of land sold by the then commissioner in equity, in pursuance of an order of the court, belonging to the defendants Eliza E. Gibson and her brother, Charles C. Black, both of whom were minors. Robert H. Reaves was soon after duly appointed guardian of the minors. On the 13th day of February,

1857, an order was made by the court of equity, directing the commissioner in equity to pay over the proceeds of the sale to R. H. Reaves, general guardian of the infants. On the 27th day of March, 1860, after the first installment due on the bond had been paid by R. C. McIntyre, C. D. Evans, commissioner, assigned and transferred the bond and mortgage to R. H. Reaves, in the following words : " For value received, I transfer the following bond and mortgage to R. H. Reaves." On the fifth day of June, 1860, R. H. Reaves assigned and transferred the said bond and mortgage for value received to A. Q. McDuffie. The bond of R. C. McIntyre was dated on — day of December, 1856, and payable in four equal annual installments, with interest payable annually from the 5th day of May, 1856. The first installment and interest was paid to C. D. Evans, commissioner, and by him turned over in money to the guardian.

From the testimony heard by the court, the following conclusions of facts have been reached :

1. That the plaintiff, A. Q. McDuffie, had full knowledge, at the time of the purchase of the bond and mortgage by him, and the assignment of the same to R. H. Reaves, that the bond and mortgage were held by him as the property of the minors, of whom he was the guardian.

2. That the plaintiff, McDuffie, paid the full value for the bond and mortgage.

3. That of the consideration paid by him, as much as $700 were paid in a debt due by R. H. Reaves, in his individual capacity, to McDuffie.

4. That at the time of the assignment of the bond and mortgage, R. H. Reaves had abundant means and good credit, and could have easily and conveniently paid the debt of $700 due McDuffie, without using the funds of his wards.

5. That at the time of the transfer of the bond and mortgage, the guardian bond of R. H. Reaves was abundantly good, and R. H. Reaves was universally considered solvent.

6. That R. H. Reaves is now insolvent, and has been for some time, and was rendered so by the late war ; and that the guardian bond is worthless.

The defendants, in their answer, first submit that R. H.

Reaves, the guardian, had no lawful authority to transfer and assign the bond and mortgage, and deny that the plaintiff is the legal holder thereof. The first question for consideration is, did the guardian have the legal power to sell and assign the bond and mortgage to the plaintiff?

It has been settled in this state by the decisions of the court, that a guardian has no right to sell the chattels of his ward. In the case of *Bailey* v. *Patterson*, the court set aside the purchase of a slave from a guardian. It has been held that, in general, guardians cannot change the nature of infants' estates, but they may do that under particular circumstances, and the court will support their conduct, if the court would do it under the same circumstances.

But in the case of *Field* v. *Schieffelin*, 7 *Johns. Ch.* 151, it is decided by Chancellor Kent, " that a guardian has legal control over a bond and mortgage held for his ward, and the right to collect and receive the money due thereon, and a legal right to sell and assign the same in the due exercise of his discretion as guardian. If the bond is not due, and the money is wanting for the purposes of the trust, either for discharging encumbrances, or for making more advantageous investments, or for payment of debts and for the maintenance and education of the ward, or for any purpose whatever connected with the faithful discharge of the trust and beneficial to the infant, the guardian has just right and lawful authority to raise the money by the assignment of the bond and mortgage. The necessity and expediency of the measure rests entirely in the judgment and discretion of the guardian."

This doctrine is sustained in the case of *Long* v. *Cason*, 4 *Rich. Eq.* 64, although it is distinctly stated in the case that it would be hazardous to recognize the doctrine as to the chattels of wards. In this case the court says : " That guardians are entitled to the possession and management of all the property of their wards, and the collection and disbursement of all their income. Their authority extends to bind the infants by all such acts as appear to be for their advantage. I apprehend that a guardian has plenary right to receive moneys coming to his ward, and to prosecute, compound and acquit any debt or liability to the ward.

But a stranger dealing with the guardian as to the choses of the ward, may rightfully presume that he is acting for the benefit of the infant, and in absence of any evidence of collusion does not partake of the guardian's responsibility. It appears to me highly important to the interests of infants and to the repose of the community, that guardians should have such power over the rights and credits of their wards."

In this same case the doctrine laid down in *Field* v. *Schieffelin*, as to the sale of bond and mortgage by the guardian, is recognized in the opinion of the court. It is said that "the views above stated have strong support from authority," and the words are quoted in *Field* v. *Schieffelin*, "the sale and assignment by a guardian to a stranger, of bond and mortgage belonging to an infant, were held valid."

The case of *Long* v. *Cason* draws a distinction between the sale of a chattel, such as a slave, and the collection of a debt or the sale and assignment of a bond and mortgage, or a chose of the ward, and seems to recognize the legal power of the guardian to sell and transfer a bond and mortgage belonging to an infant, and considers the guardian as always acting under responsibility to his ward for the faithful and judicious performance of his trust, and liable for any fraud, gross negligence, or other breach of trust. The bond in this case was due, or at least two installments of it, and the last nearly so, at the time of the assignment, and if the obligor had tendered payment, the guardian would have been bound to accept it. He clearly had a legal right to do this. This bond and mortgage were not intended by the court as an investment of the funds of the minors, for the proceeds of the sale were ordered to be turned over to the guardian, and the commissioner in equity turned over the first installment of it in money, and transferred the bond to R. H. Reaves, and not to R. H. Reaves as guardian. The form of the assignment would look as if the parties intended it as a payment of so much money as the bond represented to R. H. Reaves. The court seemed to have contemplated that money should go into the hands of the guardian, which should be securely invested by him. For aught that is known by the court, the proceeds of such sale were invested, after the sale of the bond and mortgage, by the

guardian. Under the authorities on this point and the points in this case, I conclude the guardian, R. H. Reaves, had the right and the legal power to sell and assign the bond and mortgage in question to the plaintiff.

Suppose I am mistaken in this view of the law, and the guardian had no legal power to sell the bond and mortgage, still it has been held that he may change the nature of the infant's estate, under particular circumstances, and the court will support him in the act, if the court would have directed the change under the same circumstances. Would the court have authorized the sale of this bond and mortgage under all the circumstances? I think so. The guardian, R. H. Reaves, had a good bond, was a man of means, and the bond was almost due as to all the installments. The plaintiff was offering the face of the bond and all the interest due on it. The court had ordered a change of the property of the minors from real estate into money. By authorizing a sale of the bond and mortgage for money, by the guardian, it would have accomplished this object instantly. The order of the court, directing the payment of proceeds of sale to the guardian by the commissioners in equity, would seem to be authority in itself for the guardian to have converted the bond and mortgage into money, after the transfer to him. Under this order the commissioner paid to the guardian the first installment of the bond in money collected by him. This case thus resolves itself into the question, whether the guardian committed a breach of trust in the assignment of the bond and mortgage; and whether the plaintiff was a party to that breach of trust. If there was any fraud or collusion between the guardian and the plaintiff, the transaction will be vitiated and the sale invalidated. Any concert between the parties by which the bond and mortgage were obtained at a nominal price, or at a fraudulent undervalue, or any arrangement by which a violation of trust was committed, would amount to fraud. But on this point there is evidence to show that full value was paid for the bond and mortgage, and that there was no collusion. At the hearing it was distinctly stated that no such charges were made, or that such a ground was relied upon.

But if there was no fraud or collusion, and the plaintiff knew,

or was sufficiently informed, when he accepted of the bond and mortgage, that the guardian had in contemplation a breach of trust and intended to misapply the moneys, then the plaintiff must be deemed to have taken the bond and mortgage in trust for the infants. *Field* v. *Schieffelin*, 7 *Johns. Ch.* 153. "In general, a purchaser of personal property from an executor, administrator or guardian, in good faith, and having no knowledge of any intended breach of trust, is not responsible for a misapplication of proceeds." *Hill on Trustees* 166, *note.*

In *Long* v. *Cason,* 4 *Rich. Eq.* 67, it is held "that a stranger, dealing with the guardian as to the *choses* of the ward, may rightfully presume that he is acting for the benefit of the infant, and in the absence of any evidence of collusion, does not partake of the guardian's responsibility." Was there any breach of trust committed by the guardian, R. H. Reaves? It appears that a fair and valuable consideration was paid for the bond and mortgage. There is no evidence that the guardian has misapplied or wasted the money of the infants. The fact of the present insolvency of the guardian appears, but there is no proof that the money received by him was not duly invested in other property, and was left untouched amidst the destruction of his own property. It will not do to assume a breach of trust from the mere circumstance of the sale of the bond and mortgage, or to conclude there was one from a presumption to arise from the present insolvency of the guardian. But it may be said that the use of several hundred dollars of the proceeds of the bond and mortgage in the extinguishment of his own private debt, amounted to a violation of his trust. At the time, the proof is that he was solvent, in good credit, and had ready means. If such was the case, and the payment of his private debt out of the proceeds of the bond and mortgage, was merely to avoid the form of paying over money of his own and immediately receiving it back, then this transaction would not be a breach of trust. *Rogers* v. *Sanders,* 1 *Rich. (N. S.)* 460. There is no proof to show that this amount of money was not converted by him with the remainder received by the plaintiff. The amount used in extinguishment of his own debt was small when compared with the entire amount for which the bond and mortgage were sold. But if the pre-

sumption of a *devastavit* is to be admitted, or the misapplication of the fund at the time amounted to a breach of trust, there is no evidence that the guardian had any abuse of trust in contemplation at the time; or if such was his intention, there is no sufficient proof that the plaintiff knew or had information of that intention, or of any purpose inconsistent with his duty.

The plaintiff had every reason to believe that the guardian was acting fairly and faithfully in discharging his trust. The guardian was a substantial and prosperous man, was abundantly solvent, and had given a good bond, and had command of ready money at all times. The bond of McIntyre was due in part, and he knew it could be enforced and collected by the guardian. He knew of the payment to guardian of the money collected by the commissioner, under the order of the court. There was nothing to cause even a suspicion on the part of the guardian intended to misapply the proceeds of the bond, with the exception of the payment of his individual debt, to the extent of $700, apparently out of the proceeds. Was this sufficient to make the plaintiff a participant in the violation of a trust by the guardian, or to furnish grounds for a knowledge of a design on the part of the guardian to misapply the money? The doctrine is, that a purchaser buys at his peril, when he knows that the proceeds are applied by the guardian to the payment of his own debts. But this applies when he uses the whole in extinguishment of his own debts, and there is no proof of his means to replenish or acquire an equal sum from other sources.

In this case, the proof is, the guardian had ready ability to pay the debt of $700 to the plaintiff; and the payment of this sum amounted, in effect, to the same thing as if he had first paid his debt to the plaintiff, and then received from him the same money in part payment of the bond and mortgage. I see nothing to warrant the conclusion that the plaintiff had any knowledge or information that the guardian was misapplying the funds at the time of the purchase, or had any such design. There is no ground for an inference of fraud. There was nothing in the transaction that rendered it the duty of the plaintiff to make inquiry. The plaintiff, therefore, had a right to presume, from all the facts before him, and the circumstances attending the

transaction, that the guardian was acting for the benefit of the infants. The plaintiff, in my judgment, acted in good faith, and is not responsible for a misapplication of proceeds.

It is adjudged, ordered and decreed, that the plaintiff is the lawful owner of the bond and mortgage in question, and is entitled to receive the proceeds arising from the sale of the mortgaged premises, and to any balance that may be due on the bond, after the application of said proceeds, as a credit thereon.

It is further adjudged, ordered, and decreed that the sheriff do pay over the proceeds of said sale to the plaintiff, after deducting therefrom the costs and disbursements of this action.

From this decree the defendants, Gibson and wife, and H. McClenaghan, administrator, appealed, upon the grounds that the appellants were entitled to the proceeds of the sale of the mortgaged premises, or, at least, to so much thereof as had been used by the guardian in the payment of his own debt.

*Messrs. W. J. Kerall, A. L. Evans* and *C. A. Woods,* for appellants.

*Mr. W. W. Sellers,* for respondent.

April 19th, 1879. The opinion of the court was delivered by HASKELL, A. J. The facts of the case are simple. Real estate belonging to infants was sold under an order of the court, and a bond and mortgage taken by the commissioner in equity to secure the payment of so much of the purchase money. A guardian was subsequently appointed, and the commissioner turning over to him, under an order of the court, the proceeds of the said sale, assigned to him the said bond and mortgage. The guardian sold and assigned the bond and mortgage, on which there was a balance still unpaid, to the plaintiff in this action. The purchaser paid the larger portion in money, but to the extent of about $700 he paid by a debt due to himself by the guardian personally. He (the purchaser) has now brought an action to foreclose the mortgage, and the question has arisen whether he or the infants are the legal owners of the bond and mortgage. The infants claim that they are legally entitled. The foreclos-

ure has been had, and the money is now in the hands of the
court awaiting decision upon the point. The guardian has
entirely failed to account, and is now insolvent, as are his sureties
also. The Circuit judge has decided, first, that the guardian had
the legal right to sell the bond and mortgage as if it had been
his own ; and, secondly, that even if he had not the legal right,
the sale would have been made by the court under the circum-
stances, and should now be confirmed.

The first conclusion of law is regarded by this court as
entirely erroneous, and the second as based upon a presumption
of facts which the evidence in no wise sustains. The cases of
*Bailey* v. *Patterson,* 3 *Rich. Eq.* 156, and *Moore* v. *Hood,* 9 *Rich.
Eq.* 311, are conclusive on the point that a guardian has no legal
title to the personal property of his ward, and that a sale by him
is voidable, at the option of the infant, when he comes of age.
In the former the purchaser was made to deliver up the prop-
erty, while in the latter case the court said : " It is not intended
to be intimated that the purchaser in this case could not
have been successfully pursued if he and the slaves had been
found within the jurisdiction." Page 327. The appellants
only ask against the purchaser the proceeds of the judgment of
foreclosure. They are entitled to that relief. The bond and
mortgage have been held by the purchaser in trust for them,
and must now be turned over to them as the legal owners. The
remedy for the purchaser, if he has any, is against the guardian.
This case is stronger, if anything, than that of *Moore* v. *Hood,*
where the sale was made under an order of a court, but in a pro-
ceeding to which the ward was not a party. The Circuit judge,
however, seems to rely on the case of *Long* v. *Cason,* 4 *Rich. Eq.*
60, and claims that the decision in that case " draws a distinction
between the sale of a chattel, such as a slave, and the collection
of a debt, *or the sale and assignment of a bond and mortgage and
chose of the ward, and seems to recognize the legal power of a guar-
dian to sell and transfer a bond and mortgage belonging to an
infant.*" We can find nothing in the case or elsewhere to justify
such an inference, but, on the contrary, the whole tendency of
the discussion in that case is the other way. What the case
really does decide is thus plainly stated by the court in its con-

·cluding words: "It it not necessary, in this case, to determine
what may be the operation of the statute [of limitation] against
an infant with guardian as to legal demands standing in the
name of the infant. Our judgment is limited to the case pre-
·sented. We hold that as to a chose of the infant not assignable
·at law, and peculiarly within the power and duty of the guar-
dian, the laches of the guardian, in the absence of collusion, by
·operation of the statute of limitations, bars the infant as to
strangers, and leaves him to his remedy against the guardian."
The court does discuss what is "within the power and duty of
the guardian," and in so doing distinctly recognizes the authority
of *Bailey* v. *Patterson*, and disavows any recognition of the doc-
trine intimated in *Field* v. *Schieffelin*, 7 *Johns. Ch.* 150, and held
in *Bank of Virginia* v. *Craig*, 6 *Leigh* 399, "that guardians
have the same title to the personal estate of their wards as execu-
tors have to the personal assets of their testators." The decision
·of *Long* v. *Cason* was concurred in by the Chancellor, whose
·decree was adopted by the court in *Bailey* v. *Patterson*, and
although another Chancellor (Dargan) dissented, it was upon
grounds totally different.

Examination of both opinions will show that the whole court
assented to the proposition of law that "the guardian is not pos-
sessed of any legal estate in his ward's chattels or choses." This
fact in law is the very difficulty which the dissenting Chancellor
cannot surmount; for, to his mind, the statute could only run
against the guardian if the legal title was in him; while, to a
majority of the court, it appeared that the possession of the right
of action, with the power to receive and acquit, was sufficient.
That such is the meaning is put beyond doubt by remarks in
*Moore* v. *Hood*, by Chancellor Wardlaw, who delivered the
opinion in both cases. In discussing "the rule requiring bene-
ficiaries to be parties, * * * although the trustees have
the legal title," and, *a fortiori*, where they have not the legal title,
as in the case of guardians, he says, "It was adjudged in *Bailey*
v. *Patterson*, 3 *Rich. Eq.* 156, and *recognized* in *Cason* v. *Long*,
4 *Rich. Eq.* 60, that a guardian has not the legal title of his
ward's chattels, and that his sale of them is voidable at the option
of the ward. Long ago it was decided, in *Inwood* v. *Twyne*,

2 N

*Amb.* 419, 2 *Eden* 148, that a guardian could not change the character of his ward's estate without the authority or sanction of the court, and this doctrine was recognized in *Capehart* v. *Huey*, 1 *Hill Ch.* 409." The authorities upon the point are conclusive, and the judgment of the Circuit Court that the guardian had the right and the legal power to sell the bond and mortgage in question must be reversed.

But the Circuit judge goes further, and comes to the same conclusion, in the results at least, upon the additional ground that such sale was a mere " change of the nature of the infant's estate," which would have been directed by the court under the circumstances, and which the court should afterwards confirm. The doctrine upon that subject is thus well expressed in *Long* v. *Cason:* " In general, guardians cannot change the nature of infant's estates, but they may even do that, as is said by Lord Hardwicke in *Inwood* v. *Twyne, Amb.* 419, 2 *Eden* 148, under particular circumstances, and the court will support their conduct if the court would do it under the same circumstances. They are entitled, however, to the possession and management of all the property of their wards, and to the collection and disbursement of all the income, profits and credits arising therefrom. Their authority extends to bind the infants by all such acts as appear to be for the advantage of the infants, and for which the guardians are liable to account. I apprehend that a guardian has plenary right to receive moneys coming to his ward, and to prosecute, compound and acquit any debt or liability to the ward. He always acts under responsibility to his ward for the faithful and judicious performance of his trust, and is liable for any fraud, gross negligence or other breach of trust. But a stranger dealing with him as to the choses of the ward may rightfully presume that he is acting for the benefit of the infant, and in the absence of any evidence of collusion, does not partake of the guardian's responsibility." What is meant by " possession and management of all the property of their wards " is thus defined and limited in *Moore* v. *Hood, supra:* " Management of an estate implies its administration in its existing state, but the order here affected the *corpus* of the estate and changed its nature." It will be seen that such was the effect of the " man-

agement" in the present case. The Circuit judge relies on the opening and concluding sentences of the portion above quoted, and omits to take any notice of the intervening expressions. The remarks with regard to strangers dealing with guardians are in no sense connected with the sentence of Lord Hardwicke. That part refers to transactions which are in their nature voidable at the option of the ward, but confirmable by the court if, under the circumstances, they seemed really wise and proper, though the guardian had not the legal power; while the latter portion, in speaking of stangers dealing with guardians, relates only to those transactions which flow out of the exercise of the properly legal powers of guardians, for which, while the guardians are responsible, strangers are not liable where there was no collusion. For instance, if the mortgagor had satisfied the bond and mortgage by paying the money to the guardian, and the guardian wasted the money, the mortgagor would not be liable because of the waste. But if, on the other hand, the payment had been made by means of a debt due by the guardian personally to the mortgagor, or the money had been paid with the understanding that it would be loaned back to the mortgagor without security, or for other purposes of misapplication, there would be fraud or collusion on the part of the stranger, and he would be liable. That a stranger is not protected, either at law or in equity, in the purchase of property to which the vendor has neither legal title nor power of sale, is too obviously a general proposition to need authority, and that is just the case where a guardian sells the property of his ward without authority from the court. The only grounds upon which such sale can be confirmed are those which would have induced the court at the time to order the act to be done, together with the other, that it has turned out to the advantage of the ward. The evidence produced in the case will not permit such a conclusion. The sale of the bond and mortgage was for, in part, money, and in part a debt owed by the guardian personally to the purchaser. It cannot for a moment be said that the court would have ordered such a proceeding. The change of the nature of the estate was practically from a bond secured by real estate into a loan to the trustee without any security. It was, in law, a fraud on the part of the

trustee, and the mode of payment was notice to the purchaser, for it was, *per se*, a misappropriation of the ward's money, and gave him full warning that he was proceeding entirely at his own risk, relying upon the guardian and his sureties to account to the ward. The evidence is conclusive that the character in which the guardian held the bond and mortgage was known to the purchaser, for it was upon the instruments themselves. The part payment by debt past due, and owed by another than the guardian as guardian, was in itself a misapplication, and the circumstantial evidence that the whole amount was to be put by the guardian to his own use, and that the purchaser ought to have suspected it, (if he did not know it,) is very strong. Such being the case, the burthen of proof is entirely upon the purchaser. Neither he nor the guardian have produced a tittle of proof that the whole amount was not misapplied, nor anything to justify such use of the property of the ward. It was, in substance, a loan without security to a party against whom there were at the time judgments to large amounts unsatisfied, and his circumstances at best embarrassing. And, as has been so well said in *Spear* v. *Spear*, 9 *Rich. Eq.* 184, by way of comment upon the case of *Sweet* v. *Sweet, Spears Eq.* 309, the guardian's bond is not to be regarded as the security required by law for investments of money belonging to the estate. " It is proper," says the court, " for the security of his [the guardian's] beneficiaries and his own sureties, and for the avoidance of litigation of a particularly disturbing character, that the trust estate should be secured doubly: first, by stock or bonds, in which it may be invested, and then by his own bonds." Thus, a trustee who gives his bond for the faithful performance of his duties, is bound to treat the trust funds exactly as a trustee who has not given such a bond, to act with the same diligence and to obtain the same security on his investments. The conclusion of the court is, therefore, that the sale was without authority of law; that the evidence shows no grounds which would justify the court in confirming the sale; that, on the contrary, the circumstances are such as would have rendered the purchaser liable, (*Rhame* v. *Lewis*, 13 *Rich. Eq.* 269,) if the legal title in the vendor had been proved, and only the breach of trust with collusion on the part of the

purchaser had been the question; that therefore the sale is void as against the wards, and they are legally entitled to the benefit of the proceedings in foreclosure to which they have been made parties.

The case is remanded, that such proceedings as may be necessary may be had, in conformity with the views herein expressed.

Motion granted.

WILLARD, C. J., and McIVER, A. J., concurred.